MISSOURI PACIFIC RAILROAD COMPANY, ET AL., *v*, NELSON.

4-4977

Opinion delivered March 28, 1938.

884

*Thomas B. Pryor, H. L. Ponder, Jr.,* and *H. L. Ponder,* for appellants.

*Tom W. Campbell,* for appellee.

BAKER, J. Christine Nelson, as administratrix of the estate of E. E. Nelson, brought this suit against the trustees of the Missouri Pacific Railroad Company and against Charles Ledbetter, who was the engineer upon the train at the time E. E. Nelson was killed at Moark, on April 20, 1933. This accident occurred in the western

district of Clay county, Arkansas. Train No. 26, north-bound, was approaching the railroad crossing at Moark and Nelson was driving on the highway in an easterly direction toward this crossing which is but a short distance south of the railway station.

In plaintiff's amended complaint it was alleged that the public road, at the point of the crossing, did not approach the railroad at a right angle, but at an angle of about 45 degrees, and that as Nelson drove toward this crossing he was traveling somewhat in a northeasterly direction so that his back was turned partially toward the south, the direction from which train No. 26 was approaching the crossing where the collision occurred.

It is also alleged that according to the regular schedule of passenger trains a passenger train, known as No. 7, was due at Moark from the north at 7:17 o'clock a. m. and that it was then 7:12; that train No. 26 was about forty-five minutes late and that travelers familiar with the schedule of these trains, in approaching the crossing, would not have expected a train from the south, but would have believed it would have gone north three-quarters of an hour earlier. It is also said that the track to the south of this crossing, for a distance of 320 feet was straight and at that point there was a slight curve of approximately five hundred feet for a distance of six miles.

There was the further allegation that Charles Ledbetter, the engineer, could have seen the truck in which Nelson was approaching the crossing from the time the engineer got within a mile of the crossing and continuously until he was within 100 feet of the crossing, and that the deceased Nelson approached the crossing believing that train No. 26 had already passed over the crossing forty-five minutes earlier and was expecting train No. 7 from the north at the time and that he had fixed his face to the north so as to discover No. 7, and for this reason did not discover the approach of train No. 26 from the south, and further that Nelson drove steadily onward, neither slackening or increasing the speed of his truck and that if defendants had been keeping the lookout as it was their duty to do, they would have observed Nel-

son and his truck approaching the crossing and would have observed that he was not aware of the approach of the train from the south and that they could have discovered the peril of Nelson in time to have slackened the speed of the train so as to have permitted him to cross in safety. That the defendants failed to exercise such ordinary care or in any way to slacken the speed of the train, and that the defendants did not discover the perilous position of the said Nelson in time to slacken the speed of the train and to avoid striking and killing him.

There was a further allegation that the failure on the part of the defendants to discover the peril of Nelson was due to the failure of the defendants to keep a lookout such as it was their duty to do as they approached said crossing.

These allegations, made in an amendment to the complaint, were substituted charges of negligence, upon which the appellee relied, to the exclusion of such charges as had been made in the original complaint.

On motion this case was removed to the United States district court, but upon final hearing, upon appeal to the United States circuit court of appeals, was remanded, *Nelson* v. *Baldwin,* 82 F. 2d 8; whereupon, answer was filed denying all of the allegations of the complaint.

It was alleged in the answer that the track at the point where the deceased Nelson was killed was straight and clear and that there was nothing to prevent him from seeing the train coming from the south for a distance of several miles; that he drove upon the track without taking due regard for his own safety and without stopping, looking and listening for approach of train; that had he looked he would have seen the approach of the train and could have stopped his truck and prevented the accident; that he did not look either to the north or to the south, but went over the crossing looking straight ahead and was driving without due regard for his own safety Contributory negligence and assumed risk were complete defenses to the action.

It may be stated that most of this record is made up of undisputed matters which are presented and clustered about the vital or main issues which determine the ques-

tion of liability. The only matters of evidence which we will attempt to present in discussion will be such as we find necessary to a determination of the vital issues arising out of the requirements or duties devolving upon the employees of the railroad company, representing its trustees, under the lookout statute and the proposition of discovered peril as that matter has arisen from the facts presented.

It may be helpful to state our conclusions upon a consideration of the whole case as we approach the more difficult problem determinative of the rights of the parties. We have examined the map or plat of this crossing upon which Nelson was killed, and in the same accident in which he was killed fireman Burnett, upon train No. 26, was also killed.

It is true the highway does not approach the railroad so as to cross at a right angle, but the highway approaches the railroad going in a northeasterly direction, if the railroad tracks are north and south so that the approach is at an angle of approximately 45 degrees. According to our conclusions it makes no particular difference about this angle or approach as that fact would not lessen in any degree the duty which bound Nelson, as he approached that railroad crossing, to look and listen for approaching trains from either or both directions. Although it is set forth in the complaint that Nelson had his face set to the north, looking for a train approaching in that direction, and it is further alleged that he surmised train No. 26 had already gone north three-quarters of an hour before, there is not a word of testimony in the entire record supporting these allegations. The windows on the cab of the truck were closed so that to whatever extent he may have been observed by anyone as he approached the crossing he must have been seen through the windshield or the closed windows, and since no one, except Nelson and the engineer and fireman upon the train, was very close to this crossing at the time of the accident, there is no substantial evidence tending to show that he looked in either, or any direction. The evidence is to the effect that he was driving ten or fifteen miles an hour; without increasing or decreasing his speed, en-

tered upon the crossing and was struck before he had crossed over. There is no presumption arising from any proven fact that he was anticipating a train from the north or was looking out for one. It may be presumed that he did not look to the south for the reason that had he looked he would have seen the train and certainly would not have entered upon the crossing immediately in front of him, unless it was a chosen method of suicide.

It is not seriously contended, even by appellee, that Nelson was not grossly negligent. It is not admitted that he was, except as may be implied from the fact that appellee argues that the fact of his negligence can make no difference in plaintiff's right to a recovery under the evidence upon which the suit was maintained.

It is seriously argued that Ledbetter, the engineer, could have seen Nelson's truck for a great distance, perhaps a mile, as he approached the crossing, but Ledbetter testified that he did not see Nelson approaching the track; that he was upon the right-hand or east side of the train as it ran north; that Nelson was approaching from the west; that the first time he saw Nelson was at the instant of the collision when he observed the truck as it was riding the pilot of the engine. At this impact, between this truck and this fast train, there was a bursting of the gasoline tank on the truck and an explosion. Ledbetter said he was blown from his seat, in the front of the engine cab, into the tender; that the last time he had observed his fireman, Burnett, he was in his proper place, on his seat on the west side of the engine, the side approached by Nelson. Burnett's body was found a short distance north of the point of the collision. It is immaterial whether he jumped from the burning cab or was blown therefrom by the explosion.

It is argued seriously that we must presume that as Burnett was in his place he was in the due performance of his duties. He was in the exercise of due care in keeping and maintaining a constant lookout for persons or property in dangerous proximity to the railroad track. If we presume that fact, as appellant argues we should, must we not at the same time presume that Burnett saw Nelson approaching the crossing as the train proceeded

north? And if we enter upon these presumptions must we not also presume that he gave a proper signal or call to Ledbetter as soon as it became apparent that Nelson was dangerously near to the track, not checking his speed, that it was his apparent intention to cross in front of the train? There is no evidence of these facts. As stated, we are only asked to indulge the presumptions. According to Ledbetter, if Nelson's truck was observed as it approached the track, Burnett did not apprise Ledbetter of that fact. There is evidence of this slight curve in the track, two or three hundred feet south of this crossing, which might have made it impracticable, if not impossible for Ledbetter to observe Nelson's approach, but if that be true, Burnett's opportunities for such observation were accordingly increased. There was no obstruction between the approaching train and the truck, in a space of several hundred feet south or west of the railroad crossing. The opportunity for observation and the duty to see the approaching truck corresponded exactly with Nelson's opportunity and duty to see the approaching train.

Nelson's right upon the highway, as he drove in a northeasterly direction, was not different, either less or greater, than the right of the railroad company in the use of its tracks for the operation of its trains. However, Nelson knew, as everybody knows, that although the correlative rights of those upon the highway and the train at grade crossings are equal, trains are confined to the rails; that on account of their enormous weight and the necessarily high speed of modern transportation they are much more difficult to control, and, hence, those who occupy or use the highways at grade crossings must not ignore facts so patent and dangers so obvious as to make every railroad track a danger signal.

The foregoing comments are made as the writer conceives rights to exist and continue independent of statutes. While those natural rights and obligations may not be increased by reason of statutory regulation, liabilities of the railroads, no doubt, have been increased by what is called the lookout statute as follows: "Section 11144. *Duty of trainmen—burden of proof.* It shall be the duty

of all persons running trains in this state upon any railroad to keep a constant lookout for persons and property upon the track of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout, notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the employee or employees in charge of such train of such company could have discovered the peril of the person injured in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed.'' Section 11144, Pope's Digest.

I cannot conceive at this time that there is any necessity for any attempted new analysis of the above statute. It has been construed many times and numerous citations are not necessary. One of the constructions placed upon it, however, is that the legislature, by its enactment, intended that the lookout provided for should be an efficient one; that if occasion should arise by curve, or on account of some obstruction, such as to prevent the engineer from performing that particular duty required by law, that the fireman must discharge the obligation for the railroad to the public by keeping the lookout under such conditions.

So in the case at bar, if the engineer, Ledbetter, was hindered, by reason of the slight curve in the railroad track from keeping that efficient lookout required by law, as train No. 26 approached this crossing just south of the depot at Moark, the duty to keep the lookout then devolved upon the fireman, Burnett, who was not so handicapped as he sat on the other side of the locomotive.

It is argued seriously that Burnett, immediately before this accident, was at his proper place and that he must be presumed to have been keeping a lookout. Our attention is called to the fact that this locomotive was an oil burner; that there was no occasion for the fireman to be stooping to put in fuel as this duty was performed

as he sat in the fireman's seat controlling the fuel supply by the turning of a valve. There is no doubt he was in position to observe or keep that efficient lookout required by law. If he observed Nelson as he approached that crossing we conceive it to have been his duty, when it became reasonably apparent that Nelson might not stop, to call the attention of the engineer to that fact. There is no proof in this record that he attempted to communicate any fact in regard to this impending crash to the engineer. The truth is, the engineer had no such information and his first knowledge of danger was the impact of the collision, the explosion of the gasoline while his train was still running full speed over the crossing. He himself, blinded with smoke and fire, after the crash played a heroic part by stopping the engine after the fireman and Nelson both had been killed in the accident. We have already seen how negligent Nelson was, but the very statute under consideration contains a provision to the effect that contributory negligence shall not be a defense, so, whatever may have been the negligence of Nelson, it can be of no avail at this time to give it further or extended consideration. The corresponding rights of the parties, therefore, must be determined upon consideration of other elements of the fatal disaster.

The only remaining incidents connected with this sad affair, in determination of the corresponding rights of the parties, must be settled by our conclusions arrived at from what was actually presented by the evidence and not by any indulgence of presumptions or inferences, except those necessarily arising from other facts.

There is evidence that train No. 26 was a fast passenger train and on this occasion consisted of nine passenger coaches; that it was about forty-five minutes late and its speed is variously estimated from sixty to seventy-five miles per hour. One of the allegations of the complaint is that it was operated at an excessive rate of speed. We see in this particular charge no element of negligence. The speed required of modern transportation, although not elaborately discussed in any citation

to which our attention has been called, has been mentioned in several. There is no adverse criticism in any modern citation. Of course, the speed of modern transportation carries with it the concomitant perils, and corresponding obligations to the public to exercise that higher degree of care necessary for the protection of persons and property upon or in dangerous proximity to the railroad tracks. *C. R. I. & P. Ry. Co.* v. *Tankersley, ante* p. 365, 113 S. W. 2d 114.

It was no doubt the purpose of the lookout statute, by increasing the duties or obligations of the operatives upon trains, to afford protection to those who might unwittingly, though carelessly or negligently, enter upon danger zones at or near railroad tracks and particularly at intersections or grade crossings. Even trespassers are favored objects of the beneficent purposes of the statute.

In this case it is seriously argued that had the employee for the railroad company been keeping that efficient lookout the speed of the train might have been dropped, after discovering the peril of Nelson, from seventy-five miles an hour to sixty miles and the collision might have been avoided. The conclusion reached by this argument is based upon a premise so faulty we give it no serious consideration. It is easy to say that the speed should have been decreased from seventy-five to sixty miles an hour, or from sixty to fifty miles an hour, but momentum is not so easily controlled.

In this case the evidence discloses that after the accident, when the engineer, temporarily blinded by the explosion, had found the levers controlling this locomotive and had done, as we understand, all that was possible to stop the train, it was still carried three-quarters of a mile beyond the point or place of the accident. There is no evidence at what distance, or in what length of time the speed of this onrushing train might have been so checked as to have permitted Nelson to have crossed over the track in safety, and it is more upon this very lack of evidence that liability must be founded, if at all. The statute places the burden of showing an efficient lookout upon the railroad.

. It has been argued also, both in briefs and orally, that although the law as to statutory signals was complied with, the railroad employees in charge of this train should have given some additional signal that might have attracted Nelson's attention and caused him to stop before entering upon the intersection. In other words, it is urged that some extraordinary signal, not given, should have been used to attract the attention of Nelson. The fault of this argument is that it presumes that the operatives of the train merely met the statutory requirements as to signals. That is not the proof, however. The evidence, as abstracted, does not show the kind of signals that were given, except the sounding of the whistle and ringing of the bell. The complaint is not founded upon a lack of signals. In fact, nothing is said about these signals, so the complaint must be deemed, by its omission, to have been a concession upon the part of the plaintiff that at least the statutory requirements as to signals, the ringing of the bell and sounding of the whistle, were complied with, but that does not open the way for an argument based upon the proposition discussed as a stated or admitted fact, to the effect that only these signals were given and that others might have been more efficient. No such presumption follows as a necessary conclusion. Though we were willing to say that the statutory requirements as to ringing the bell and sounding the whistle are minimum requirements as to signals, no evidence has been abstracted showing that any other kind of signals could have been made that were not in fact made, and the ingenuity of counsel will not be permitted to supply such a fact not established by proof.

The remaining matters for consideration arise out of undisputed facts. As Nelson approached this grade crossing there must have been a time when it became apparent, at least to the fireman, Burnett, if Burnett was keeping the lookout required by law, that Nelson was ignoring the onrushing train and that he might or would not stop. This occurred, of course, at a time when it was too late to stop the train, but we cannot say as a matter

of law that it was too late, if Burnett had communicated to Ledbetter the fact of this imminent danger, for Ledbetter to have applied the emergency brakes and to have slowed to some extent the train in the last two hundred or three hundred feet of its approach to the crossing. The truck was struck about two feet from the rear end.

We cannot say as a matter of law that the injury or death of Nelson could not have been avoided had this been done. We think it apparent, or at least the jury may have so found, even if it is not apparent, under the case as developed here, that Burnett was not keeping the lookout required by law and did not observe Nelson's dangerous proximity to this grade crossing, or if he did keep such lookout and did so observe Nelson's impending danger, that he failed to communicate what he had observed to Ledbetter, the engineer who was in control of the locomotive pulling this long and heavy train. Nor does it appear as a matter of law that Ledbetter might not have avoided the dangerous or fatal collision had he received from Burnett some word or signal as soon as Burnett did observe or could have, in the exercise of proper care, under the statute, Nelson's peril immediately before the collision. What actually happened in the few seconds immediately preceding the fatal accident were matters of fact, not legal presumptions or conclusions, that determined the liability or non-liability of a railroad company.

Since these matters were facts, not matters of law, it was proper there should be a submission of them for determination by the jury.

One of the most recent cases involving the lookout statute is that of *C. R. I. & P. Ry. Co.* v. *Tankersley, supra.* In that case it was held that there was no negligence on the part of the employees of the railroad company. They were keeping the lookout required by law as the little deaf child approached the railroad tracks. They gave proper alarms or signals. They applied the emergency brakes as soon as it became apparent that she might enter the zone of danger. It was impossible, after her peril was discovered, to avoid the accident. It was

there held there was no liability. The accident was occasioned in the operation of a fast train.

We have been cited to the case of *Jemell* v. *St. L. S. W. Ry. Co.,* 178 Ark. 578, 11 S. W. 2d 449. In this case a proper lookout was kept. Jemell was seen as he drove his car up to a point near the tracks and then permitted it to roll back down the grade of the crossing for some distance. The train was approaching at this instant not far away. The railway employee presumed that he had seen the train and would not attempt to cross immediately in front of it. It is said that when the fireman saw the plaintiff drive his car up to the end of the ties and back down the grade he had no idea he would come up again. He believed he was going to stop until the train passed. Jemell, however, drove his car back up that grade and said that he didn't remember anything further. He was struck on the crossing. According to the evidence in that case the whistle was sounded and the bell was ringing. The engineer of the train had slowed it down because he was following a freight train and the rules required him to remain at least a safe distance to the rear of it. There was involved in the trial of that case the comparative negligence statute cited there as § 8575, Crawford & Moses' Digest, now § 11153, Pope's Digest. The late Chief Justice HART said with reference to the case cited for a reversal:

"We do not think the cases referred to have any application under the facts in the present case. In all of them there was a disputed question of fact as to whether the proper lookout required by the statute was kept, and whether or not the lack of keeping a proper lookout was the proximate cause of the accident, and therefore constituted negligence on the part of the company which could not bar a recovery notwithstanding the jury might also find that the injured person was guilty of contributory negligence."

In other words the decisive factors in the Jemell case is that it was undisputed that a proper lookout was kept and operatives on the train were not otherwise negligent, but the failure of Jemell negligently to see the

train was the proximate cause of the accident. For that reason it was held that the comparative negligence statute was available as a defense.

We have also been cited to the case of *M. P. Rd. Co.* v. *Trotter,* 184 Ark. 790, 43 S. W. 2d 762. A reading of that case will disclose the careful consideration given in the preparation of the opinion, as was characteristic of the late Justice BUTLER. One of the allegations of negligence in that suit was the failure of defendant's servants to give the statutory signals of the train's approach. He also alleged that it failed to keep an efficient lookout, which if kept would have disclosed his peril in time to have avoided injuring him. Trotter testified that he failed to hear the whistle or bell upon the occasion of his injury, but it was testified by the engineer and fireman, and also by a section hand, that the whistle was blown and the bell was rung, and that these alarms were kept up continuously for the time or distance required by law. It was held that there was no testimony of any probative value such as to contradict the direct testimony of the operatives of the train as corroborated by other witnesses to the effect that proper alarms were given and the error arose in that case on account of the submission of the undisputed evidence in regard thereto to the jury. But the operatives of the train, at least the engineer and fireman, testified they were keeping a constant lookout, but they failed to see Trotter upon the railroad track. It was said in that case:

"The jury might have found that the negligence of the appellant in failing to discover the peril of the appellee was greater than that of the appellee in going heedlessly upon the track, and again it might have found that this negligence was not equal to that of appellee, but that appellant's negligence in that regard, coupled with the failure to blow the whistle and sound the bell, made its negligence greater than that of the appellee and warranted a recovery."

This case was reversed and remanded for a new trial upon the question of the proper or efficient lookout and a failure to discover the peril of Trotter. In that

case the case of *Huff* v. *M. P. Rd. Co.*, 170 Ark. 665, 280 S. W. 648, was cited, as the same case has been cited here for our consideration.

The principal thing decided in the Huff case was that the lookout statute applied equally to property damages as to personal injuries. One of the leading authorities cited in the Huff case was that of *Blytheville, Leachville & Arkansas Southern Ry. Co.* v. *Gessell*, 158 Ark. 569, 250 S. W. 881, following the doctrine announced in the cited case, the court said: "Even if a proper lookout had been kept, contributory negligence would not bar a recovery where the injury was caused by negligence in failing to exercise care on the part of the engineer or fireman to avoid the injury after discovering the peril. So contributory negligence was not a bar to recovery, either under the lookout statute or under the doctrine of discovered peril."

In the case of *M. P. Rd. Co.* v. *Sanders*, 193 Ark. 1099, 106 S. W. 2d 182, we have another opinion delivered by the late Justice BUTLER and with characteristic precision and ability to distinguish the legal propositions as they were presented; we find these authorities strikingly pertinent. It was held in that case that it was not open to dispute that the engineer was keeping the lookout required by law. He saw Sanders and his companion as they drove along the highway, going in the same direction as the train. They turned, however, and drove squarely in front of the train. When the engineer saw them last it was at a place of safety. After that they turned and drove in front of the train. The court says: "The fact appears to be clear that no lookout by the operatives of the train would have disclosed to them the danger of the car and its occupants except at a time when the car was so near the track, and in the act of entering upon it, that to avoid striking it was not humanly possible."

In that case it was also held that the testimony of the engineer might not arbitrarily be disregarded as it was not contradicted by other evidence, either direct or circumstantial.

Upon this same question a like declaration of law was set out as in *M. P. Rd. Co.* v. *Trotter, supra.*

From these authorities the case at bar may be distinguished in several respects. We cannot, or do not know what the fireman, Burnett, saw, if anything. He, too, was killed. We have hereinbefore stated the effect of the testimony of the engineer, Ledbetter, but Ledbetter was a party to this suit and, being a party, his statement will not be accepted as undisputed. *Seeman* v. *Hilderbrand, ante* p. 677, 113 S. W. 2d 724; *French* v. *Browning,* 187 Ark. 996, 63 S. W. 2d 647; *M. P. Rd. Co.* v. *Trotter, supra.*

We think the case of *Baldwin* v. *Clark,* 189 Ark. 1140, 76 S. W. 2d 967, is conclusive of all the foregoing matters. Clark was killed just three days prior to Nelson's death. The facts are not essentially dissimilar. A recovery was there upheld upon identical matters as here presented. Clark was not seen, though he might have been, had a lookout been kept, until the moment of the accident.

It must be apparent that the evidence in regard to the lookout is not at all satisfactory. We have just cited from the authorities that contributory negligence was not a bar to recovery, either under the lookout statute or under the doctrine of discovered peril. We cannot say, as a matter of law, or as a legal conclusion arrived at from a consideration of the testimony, that had a proper lookout been kept the accident would have occurred notwithstanding, and since we cannot make such declaration, the question of a proper lookout and also the question of discovered peril were properly submitted to the jury.

Appellant urges two other propositions. The first is that the Interstate Commerce Commission made an investigation and a report of this accident and its causes. By agreement, evidence from this Interstate Commerce Commission report was read into the record, but appellants insist the court should also have accepted the report of that commission. We have not been cited to any positive authority, statutory or otherwise, requiring the

acceptance of the determination of such tribunal in the trial of cases like this one. It was not a court. It was not a hearing between the same parties, but an *ex parte* proceeding and the conclusions of that commission might perhaps serve only to confuse. At least, there is no authority for its acceptance.

There was also offered in evidence by appellant a judgment in favor of Mrs. Burnett, the widow of the deceased fireman, who sued the Sinclair Oil Refining Company for damages arising out of the negligence of Nelson who operated its truck. Its admission was denied. It is not insisted that the judgment in that case should be binding in the instant case. Perhaps it may be said that it was deemed at least persuasive.

We have already indicated our opinion of Nelson's conduct as to being negligent and perhaps would have approved a recovery against his master under the doctrine of *respondeat superior* on account of his negligence, but that proceeding was not between the same parties, nor was it in regard to the same issue. It only arose out of the same accident.

It is unnecessary to extend unduly this opinion. On that account we merely say there was no error to refuse the admission of this judgment in evidence.

We have given careful consideration to the whole case and every issue involved on appeal. There is no prejudicial error.

The judgment is, therefore, affirmed.

GRIFFIN SMITH, C. J., SMITH and McHANEY, JJ., dissent.