Missouri Pacific Railroad Company *v.* Davis.

4-5340 125 S. W. 2d. 785

Opinion delivered February 20, 1939.

*T. B. Pryor* and *Daggett & Daggett,* for appellant.
*Mark B. Grimes* and *W. J. Dungan,* for appellee.

SMITH, J.  G. M. Davis and his son, Clarence Davis, a man twenty-four years of age, were engaged in the joint enterprise of shipping and selling watermelons.  On August 3, 1937, they drove a truck load of melons, with Clarence at the wheel, through the town of McCrory, on their way to the city of Wynne.  They were traveling on highway 64, a paved road, when they came to a crossing over the tracks of the appellant railroad company between the hours of 9 and 10 o'clock a. m.  The highway makes a large S turn but crosses the track at nearly a

right angle. Pictures of the crossing indicate that the track is about two feet above the land over which it runs. As the truck drove upon the crossing a fast passenger train of eight or ten coaches approached from the east, going towards McCrory. The train was running at a speed of 70 to 72 miles per hour. There was a strip of woods south of the track and about 600 feet east of the crossing which prevented the driver of the truck from seeing the train for more than 800 feet until the truck was within 100 feet of the crossing. At a point 50 feet from the crossing the truck driver had a clear view of the railroad track to the east for a distance of 2,500 feet. The track was straight. The woods which obstructed the view of the train also obstructed the view of the truck as it approached the crossing. A collision between the train and the truck occurred at the crossing, and both Davis and his son were seriously injured. They each sued for the sum of $3,000 and recovered judgments to compensate their injuries, from which is this appeal.

Davis and his son both testified that the speed of the truck was reduced to from 5 to 10 miles per hour as they approached the crossing. They had seen a freight train switching in McCrory as they passed through that town. They saw smoke, which proved to have been in McCrory, and they were looking in that direction to see if a train was approaching from the west, the direction of McCrory. They did not see the train until it was upon them, and the rear end of their truck was struck by the train. The front wheels of the truck and the cab had crossed the track when the collision occurred. No signal was given by blowing the whistle or ringing the bell as the train approached, until just before the collision, when two short sharp blasts of the whistle were blown. In this statement plaintiffs were corroborated by the testimony of a boy who was a passenger on the train and a man who had stopped his car about a quarter of a mile from the crossing to put water in the radiator of his car. There was no reduction in the speed of the train until after the collision. The emergency brake was applied as the collision occurred, but the train ran, according to some of the witnesses, about seven or eight times the

length of the train before it stopped. The fireman gave the distance at 14 times the length of the train.

The engineer and fireman testified that after the application of the emergency brake the engine rocked with such violence that they feared the train would be derailed and wrecked, but it finally stopped, after one of the wheels of the engine had run off the rail, and that the engine almost turned over.

A Mr. T. A. Smith, who lived in Forrest City, testified that he was riding in his automobile with his 16-year old granddaughter a short distance behind the truck. Before he saw the train he heard it whistle for the crossing about a quarter of a mile from the crossing, and he also heard the bell ringing. As he approached the crossing he was about 15 feet behind the truck, and he stopped his car about 100 or 150 feet from the crossing, and he supposed the truck was also about to stop, as it slowed down to almost a snail's pace, as the witness expressed it, but the truck drove on at a speed of about one or two miles per hour over the crossing. The young lady also testified that she heard the train whistle for the crossing, and heard the bell ringing, and in other respects corroborated the testimony of her grandfather. They were both very positive that the train first whistled for the crossing, and very soon thereafter again whistled, just as the collision was about to occur.

In view of this conflict in the testimony, we must assume that the jury found that no signals for the crossing were given by the train, and that the whistle was only blown just as the collision occurred, and that the railroad company was negligent in the operation of the train.

The engineer and fireman both testified that they were in their respective places, the engineer on the right side of the cab and the fireman on the left. The engineer testified that on account of the size and length of the engine he did not see the truck until it was within about 50 feet of the track. The truck approached the crossing from the south, or the fireman's side, and the fireman testified that he saw the truck as soon as the engine passed the woods which obstructed his vision to the south. He was in a better position to discover the truck and per-

sons approaching the crossing than was the engineer. The fireman further testified that the truck was reducing its speed as it approached the crossing, and that he thought the truck would stop and had done so. When he saw that the truck was about to cross in front of the train there was nothing he could do except warn the engineer, and this he did by jumping from his seat to that of the engineer, who immediately blew two short blasts of the whistle and applied the emergency brake.

The testimony shows that both the engineer and the fireman were thoroughly familiar with this crossing, as were also Mr. Davis and his son.

We have, therefore, a case in which it appears that the jury found that there was negligence on the part of the railroad company in the failure to give warning of the approach of the train to the crossing; but it appears to be utterly unreasonable to say that this negligence was comparable to that of the plaintiffs, or that the jury was warranted in finding that the plaintiff's negligence was of less degree than that of the railroad company.

Contributory negligence is no longer an absolute defense in actions of this character. Under our Comparative Negligence statute (§ 11153, Pope's Digest) there may be a recovery, notwithstanding the negligence of the person injured, if that negligence is of less degree than that of the operatives of the train.

We have held in numerous cases that it is the duty of the jury to weigh and compare the evidence and determine the relative degrees of negligence, and, that ordinarily, the finding of the jury is conclusive of the issue as to the degrees of negligence. But, as was said by Chief Justice McCulloch in the case of *St. Louis-San Francisco Railway Co.* v. *Horn,* 168 Ark. 191, 269 S. W. 576, cases may arise in which the question becomes one of the legal sufficiency of the testimony to support the finding made, and that this is a question of law for the court.

These questions were thoroughly considered and discussed in the opinion by Kenyon, Circuit Judge, in the case of *Bradley* v. *Missouri Pacific Railroad Co.,* 288 Fed. 484, which arose out of a collision between a train and

an automobile in the city of Prescott, this state. The excess of the plaintiffs' negligence over that of the railway company appears to us to be much greater in this case than in that one. In that case, as in this, "Evidence was introduced as to the negligence of the railroad company in failing to whistle or ring the bell and in running the train at a high rate of speed approaching this crossing." After quoting our Comparative Negligence statute, Judge KENYON said: ". . . and (the statute) does not attempt to take from the court the right, where no other inference can be drawn from the evidence by reasonable men, to decide as a question of law that the evidence of negligence on the part of decedent equaled or exceeded that of the railroad company."

This was the view expressed by Judge McCULLOCH in the Horn Case, *supra.*

What Judge KENYON said of the conduct of the party killed in that case is equally applicable here. He said: "The only reasonable inference that can be drawn from their conduct is that they did not look, or, if they did and saw the train, deliberately took the chance of beating it over the crossing. If the former, they were guilty of gross negligence—if the latter, gross recklessness. If parties driving automobiles persist in gambling with death at railroad crossings, their estates should not be augmented by damages if death wins. Care, not chance, is the requisite at railroad crossings."

It is inconceivable that a heavy train, traveling 70 to 72 miles per hour, could have been proceeding noiselessly, even though the whistle was not sounded or the bell rung. The truck was being driven over a paved highway. The grade of the crossing was almost negligible, but the truck was being driven up, and not down, this grade, whatever it may have been, and no one places Davis' speed at more than 10 miles per hour, and the witnesses who placed it that high said "From 5 to 10 miles per hour." A mere glance to the east would have revealed the approach of the train in ample time to have stopped the truck, and the only excuse offered for not looking in that direction was that smoke was seen to the

west, but the undisputed testimony is that this smoke was in McCrory, three miles west of the crossing.

Under these circumstances, it is not merely to split hairs, it is to trifle with the testimony, to say that the jury was warranted in finding that the negligence of the plaintiffs was of less degree than that of the railroad company. In our opinion, the trial court should have told the jury, as a matter of law, that the negligence of the plaintiffs was not of less degree than that of the railroad company.

It is insisted, however, that, notwithstanding the degree of the plaintiffs' negligence, they were entitled to recover under the doctrine of discovered peril, and that issue was submitted to the jury under an instruction numbered 5, to which many objections were made, reading as follows: "You are instructed if you find from a preponderance of the evidence in this case that as said train was approaching said crossing from the east traveling west the attention of the plaintiff was attracted to the west by smoke down the railroad track to the west so that the plaintiff thought that a train might be coming from the west towards said crossing and caused the plaintiff to look down the railroad track to the west as he approached and passed over said crossing in said truck, and the said employees of the defendants in charge of running and operating the engine of said train, saw and knew that the plaintiff was approaching and about to cross said tracks, and that he was in peril of being struck by the engine they were operating, if you find from a preponderance of the evidence the plaintiff was in such peril, and that the said employees in charge of the engine of said train failed to exercise ordinary care to avoid striking him after discovering his peril, if you find they did fail to do so, and that said conduct on the part of said employees in charge of the engine of said train, if you find they were guilty of such conduct, was the cause of the injuries to the plaintiff, then you should find for the plaintiff against the defendants."

Upon this issue the court charged the jury in another instruction numbered 7, reading as follows: "You are instructed that the servants of the defendant engaged in

the operation of the train had the right to assume that the plaintiffs in approaching the crossing, would act in response to the dictates of ordinary prudence and the instinct of self-preservation and would, in fact, stop before placing themselves in peril; and you are further instructed that the duty of the engineer and fireman to take precautions to avoid striking the plaintiffs arose only when they discovered, or should, by the exercise of reasonable care, have discovered the peril in which the plaintiffs were about to place themselves.''

Does the testimony warrant the submission of that issue to the jury, and is it sufficient to sustain the finding that there was negligence after the discovery of the peril?

The undisputed testimony shows that a lookout was being kept by both the engineer and the fireman, and the presence of the truck was discovered as soon as the train had passed the timber. The fireman saw the truck approaching the crossing, but all the testimony is to the effect that the speed of the truck was being reduced, and the fireman had the right, as the court told the jury, to assume that the driver ''would act in response to the dictates of ordinary prudence and the instinct of self-preservation and would, in fact, stop before placing themselves in peril,'' and to rely upon that assumption until, in the exercise of reasonable care, he was aware, or should have been aware, that the truck would not stop. The very instant this discovery was made, and we think there was no testimony to support a finding that it could have been sooner made, the fireman jumped from his seat to warn the engineer, who had sole control of the movement of the train and was the only person who could do anything at all, and the engineer immediately did all that was possible. He first blew the warning whistle, and then applied the emergency brake, with such force that he came near wrecking the train and imperiling the lives and safety of the passengers on it.

A short but a perceptible interval of time was required for the fireman to warn the engineer, who first blew the whistle and then applied the air. The undis-

puted testimony was to the effect that "It would take at least a second, or more, probably a second and a half, for the air that escapes from the brake cylinders to permit the pistons to force the shoes against the wheels of the car; it would take possibly a second and a half, possibly two seconds, for you to notice it." And during that time the train was moving 102 feet each second.

The first witness called by the plaintiffs was the engineer, who testified that a train such as his, going 70 miles per hour, could be stopped in 2,500 feet; and that while traveling 500 feet he could slow his train from 70 miles to 50 miles per hour, and in 800 feet he could slow it down to 40 miles per hour, and in 1,000 feet he could slow it down to probably 25 or 30 miles per hour. There was an emergency stop in this case, and the engineer came near wrecking his train, and did derail a wheel of the engine. There is no reason to believe that he could have stopped the train quicker than he did, or that he could have reduced its speed sufficiently to enable the truck to cross the track in safety, after discovering its peril.

Under these circumstances, we think there was no testimony to support the finding that due care had not been used after the discovery of the peril, and in view of the physical fact established to an undisputed certainty that at a point 50 feet south of the crossing the plaintiffs, or either of them, could have seen the train a distance of 2,500 feet, had they looked east, we feel constrained to hold that there is no liability in this case.

The judgments of the court below must, therefore, be reversed, unless we are to hold that railroads are insurers against the carelessness or recklessness of persons crossing railroad tracks, and as the cases appear to have been fully developed they will be dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.