RUTH STANDRIDGE McGLOTHIN, Administratrix of the Estate of OWEN STANDRIDGE, v. GUY A. THOMPSON, Trustee of the Missouri Pacific Railroad Company, a Corporation, Appellant,—148 S. W. (2d) 558.

Division One, March 13, 1941.

*Thos. J. Cole, Fred W. Barrett, Henry D. Green* and *David E. Blair* for appellant.

*Gordon Doris* and *Sizer & Myres* for respondent.

HYDE, C.—This is an action for damages for wrongful death under the statutes of Arkansas. [Sections 1074-1075, Crawford and Moses Digest of Laws of Arkansas; Sections 1277-1278, Pope's Digest of Laws of Arkansas.] Plaintiff's father was killed when his automobile was struck by defendant's train at Russellville, Arkansas. Plaintiff had a verdict for $20,000. *Remittitur* of $8000 was ordered and made. Judgment was entered for plaintiff for $12,000, and defendant has appealed.

The negligence charged and submitted by plaintiff was failure to give statutory crossing signals by bell and whistle (Section 8568a, Crawford and Moses Digest; Section 11135, Pope's Digest) ; failure to keep statutory constant lookout for persons on or about to go upon the tracks at the crossing (Section 8568, Crawford and Moses Digest; Section 11144, Pope's Digest) ; and common-law negligence in the operation of the train at an excessive rate of speed over the crossing and into the city. The defense was contributory negligence, because of which defendant contends that plaintiff failed to make a jury case. Under the Arkansas comparative negligence (Section 8575, Crawford and Moses Digest; Section 11153, Pope's Digest), this means a contention that the negligence of deceased was as a matter of law equal to or greater than any negligence shown on the part of defendant's employees. [Mo. Pac. Railroad Co. v. Davis (Ark.), 125 S. W. (2d) 785.; C., R. I. & P. Railroad Co. v. Tankersley, 195 Ark. 365, 113 S. W. (2d) 114; Sanders v. Mo. Pac. Railroad Co., 197 Ark. 451, 106 S. W. (2d) 177; Mo. Pac. Railroad Co. v. Brewer, 193 Ark. 754, 102 S. W. (2d) 538.] Defendant also contends there was no evidence upon which to base the submission of failure to keep a constant lookout. These contentions require a consideration of the evidence from the viewpoint most favorable to plaintiff.

The crossing where the collision occurred was at the eastern edge of Russellville, a city of 7000 or 8000 population. The automobile (a Chevrolet), which plaintiff's father, Owen Standridge, owned and

in which he was riding, was going north on U. S. Highway No. 64, a concrete main highway through the State going from Russellville to Little Rock. It was being driven by his son, Ray Standridge, 18 years old. The train was going in a northwesterly direction, as the railroad crossed the highway at an angle of about 10 degrees north of due east and west. The highway was the eastern boundary of the city. The main track was on the same level as the highway at the crossing, but was slightly higher than the level of the ground to the east of the crossing. There was a switch track, south of the main line, which crossed the highway at the right of way line 50 feet from the center of the main track. (The distance between the nearest rails of the two tracks was 46 feet.) This switch track went to the southeast off of the right of way to a large compress warehouse. The northwest corner of this compress building was 90 feet from the main line track. This building was about 20 feet high. It had rock walls 18 to 20 inches thick. This construction tended, to some extent, to prevent one (approaching from the south) hearing a train coming from the east. This compress was about 290 feet wide north and south and 760 feet long east and west. It was built on the direction line of the railroad track instead of due east and west. The northwest corner of the compress was 125 feet from the edge of the pavement while its southwest corner was only 67 feet from it. Between the switch track and the main line track near the middle of the compress building (about 400 feet east of the crossing) there was a large boiler house and coal house. There was also on the right of way line four hose houses, two of which were on each side of the larger buildings. (Nearest hose house was 290 feet east of crossing.) These buildings extended about 4 feet over the right of way line and were therefore about 46 feet from the center of the main line track. Observations and measurements by surveyors for defendant showed at 200 feet south of the main line track that, because of these buildings, it was only possible to see a train on 291 feet of the main line east of the crossing; but that at 125 feet south it was possible to see a man on the main line 384 feet east of the crossing; and that at 90 feet south a man could be seen 571 feet east.

Plaintiff's evidence, however, showed that there were weeds, brush and bushes (sweet gum, sassafras and other growth) in the right of way between these buildings and the track which were from one foot to five or six feet high, some up to twelve feet in height; and that these to some extent further obstructed the view. A witness said some of these were on a dump "down below the boiler room" between the two tracks "where dirt has been thrown up there when they were fixing the track." Another witness said, "the brush was between the main line and this boiler room." (Plaintiff had evidence that some of this growth was cut off on the following Monday morning; pictures put in evidence by defendant were taken on that Monday

afternoon.) Plaintiff's witnesses said that "you have to be up practically on the main line of that railroad to see a train coming from the east;" and that "you would have to be within ten feet on the main track to see one down to this boiler room." However, the track was straight for more than a mile beyond the quarter mile whistling post, and defendant's evidence showed that it was possible to see as far east as this whistling post after crossing the switch track; but it was not possible to see the train beyond the whistling post because of a cut and grade beyond it. Defendant's surveyors made their observations after the time plaintiff's witnesses said the brush was cut.

Nevertheless, after passing the switch track beyond the line of the boiler house 46 feet from the center of the main line track, there was nothing to obstruct the view to the east (or southeast) except such weeds and brush as there were, at the time, between the two tracks, although the angle at the crossing required a driver to look somewhat to his rear to observe a train approaching. There were two large crossing signs south of the main line track, but all of the persons in the car had been over this crossing before and were familiar with it.

The train involved was a local freight of eleven cars. It ran daily except Sunday, but was run as an extra, not represented on the time card, and had no regular time to make. On the day of the accident (October 23, 1937) it was somewhat later through Russellville than usual. It was Saturday and the traffic on the highway was heavy. The accident occurred about 4:30 P. M. The sun was shining and the ground was dry. It was a warm day and all windows of the automobile, both front and back, were open. Plaintiff had evidence that the speed of the train was between 50 and 60 miles per hour. Defendant's evidence showed a speed of about 35 miles per hour. Defendant's evidence also showed that this train had a speed limit of 50 miles per hour "at this place, east of town, throughout the yard limits." Plaintiff had evidence (of compress workers, a man walking near the compress, and the survivors of the accident) that there was a failure to give the statutory warning signals, and that there were no whistles until the train had passed the boiler house of the compress and was close to the crossing. (One said he "heard the whistle just about 100 feet before it crashed;" another said, "the whistle hadn't hardly cut off when he heard the crash.") Defendant had many witnesses to show that full statutory warning signals were given. These included people who lived in the neighborhood, men at the station more than a half mile west of the crossing and the occupants of two cars which stopped (one on each side of the crossing) because they heard its signals. Plaintiff's evidence was that there was only one whistle, which was after the engine passed the boiler house, and that "just after the whistle blowed the crash was on." Deceased's

car passed the car, on the south side of the crossing, after it stopped for the train; before it reached the switch track. Defendant's evidence was that this car was stopped about 100 feet south of the track and that the engine was only about 200 feet east of the crossing when the Standridge car passed this car.

Plaintiff's father and mother who were riding in the front seat of the car were killed, as was also her brother, who was driving the car. The survivors of the accident were witness Vinson and his stepson, John Morgan, who was sitting on his lap on the back seat of the car (on the left, west, side behind the driver) because of groceries and other articles therein, including a King heater stove, on the right, east, side of the car. Vinson testified that the car was driven at about 15 miles an hour from the point beyond the southwest corner of the warehouse (about one block from the crossing) where they turned north toward the crossing, until near the switch track. He said that Mrs. Standridge said "we must watch out for the train." He said that Ray Standridge "went over the switch track without stopping," and did not stop the car at any time, but "looked both ways" from near the switch track; he "slowed down a little," and "continued to reduce his speed before he got to the crossing." He said that Ray "kept his eyes to the east," after crossing the switch track, and that his father also "looked both ways." He said "you couldn't see until you got close to the switch track." He also said that about where they turned north another car passed them "going fast" and went on across the track, and "got across the track all right." He saw no other cars on either side of the crossing. He further stated that he had looked down the track and had not seen the train, and that their front wheels were on the main line track before he saw it. John Morgan testified to similar facts. He also said that Mrs. Standridge said "watch out for the train;" that she addressed this remark to the whole crowd; and that they "all looked for the train." Considered most favorably to plaintiff, it seems reasonable to construe this testimony as meaning that Mrs. Standridge made this statement because she knew they were approaching the crossing and not because she saw or heard the train. The car was hit about the center and thrown to the south side of the track. Plaintiffs witness Ed Morgan, who said he was walking on the east side of the highway "just a few steps" south of the switch track, stated there were no other cars between him and the main line when the Standridge car passed him, but that one had gone over the crossing ahead of it. He also said that it "slowed down" at the switch track; that it "was over the first crossing" when "it was slowing down;" that it "then started right up again;" and that the engine "whistled about the time it hit the car." He heard no other prior signal by bell or whistle. Occupants of the car on the south side said it was stopped

90 feet from the track. The driver of the car on the north side said he stopped 40 feet from the track.

All of the trainmen said that the bell was ringing from the whistling board, and that the engineer blew alternate long and short whistles all the way to the crossing. The testimony of the trainmen on the engine was that both the head brakeman and the firemen were in their seats on the left, south, side of the engine. The brakeman's seat was in front of and lower than the fireman's seat. The brakeman said that, at the yard limit board, a mile and a half east of the crossing, "we seen the track was clear, so the fireman told the engineer it was O. K., so he proceeded, and come on down past the compress there. I seen an automobile was parked off on my side—the left hand side, to the right of the road. Another automobile whipped around that one that was parked there; come on up and it looked like he was going to stop." He said, when the pilot was 20 or 30 feet east of the crossing, that "the automobile drove right on up and we hit it;" that it was then impossible to stop the engine; and that it could not have been stopped any sooner than it was (500 feet west of the crossing) stopped by the engineer. The testimony of the fireman was that "there was a car parked about a hundred feet from the crossing, on the south side of the track;" that "this other car ran round him;" that "I didn't have any idea he was going to start across until it hit;" and that "they do that every day; they get in ahead and get ready to cross." He also said that the train was about 200 feet east of the crossing when the first car stopped, and that when he saw the Standridge car pass the other car it was going about as fast as the train (but his testimony corroborates slowing because the car only traveled half as far as the train after he saw it) ; the train going "about 35 miles an hour." He further stated that the engineer "was pulling the whistle cord" at the time, and he "hollered and said 'you hit a car;' " and that "he was reaching for the brakes as soon as he hit." He admitted that "the engineer didn't know anything about it until (the train) had hit him." This was also the testimony of the engineer, who said that "when the crash came—when he hit the car . . . I immediately put on the air brakes—in emergency;" and that neither the engineer or fireman said anything to him before that.

Plaintiff made a jury case on the issue of defendant's negligence in failing to give statutory warning signals although there was much evidence to the contrary. We also think plaintiff made a jury case on the issue of excessive speed although the evidence was widely conflicting. However, in a recent Arkansas case, Missouri Pacific Railroad Co. v. Nelson, 195 Ark. 883, 115 S. W. (2d) 872, it is said: "It (the train) was about forty-five minutes late and its speed is variously estimated from 60 to 75 miles per hour. One of the allegations of the complaint is that it was operated at an excessive

rate of speed. We see in this particular charge no element of negligence. The speed required of modern transportation, although not elaborately discussed in any citation to which our attention has been called, has been mentioned in several. There is no adverse criticism in any modern citation. Of course, the speed of modern transportation carries with it the concomitant perils, and corresponding obligations to the public to exercise that higher degree of care necessary for the protection of persons and property upon or in dangerous proximity to the railroad tracks.'' However, plaintiff's evidence here showed speed coming into a city in excess of defendant's own speed limit regulation, and defendant's engineer admitted that ''anything over 50 miles an hour would be unusual and excessive.'' This element of violation of defendant's own speed regulation was not present in the Nelson case. Therefore, we will consider that there was substantial evidence to submit these two issues; that the jury decided, on these two issues, defendant was negligent; and also decided that deceased's negligence was less than that of defendant. It is also plain that the evidence, considered most favorably to plaintiff, does conclusively show negligence of Owen Standridge, and his minor son who was driving his car for him. [Mo. Pac. Railroad Co. v. Davis (Ark.), 125 S. W. (2d) 785; Mo. Pac. Railroad Co. v. Brewer (Ark.); 102 S. W. (2d) 538, and cases cited.] ██ This contributory negligence is not an absolute defense unless it was equal to or greater than defendant's negligence. It is the Arkansas law that the ''legal sufficiency of the testimony to support the finding made . . . is a question of law for the court;'' and that the comparative negligence statute ''does not attempt to take from the court the right, where no other inference can be drawn from the evidence by reasonable men, to decide as a question of law that the evidence of negligence on the part of decedent equaled or exceeded that of the railroad company.'' [Mo. Pac. Railroad Co. v. Davis (Ark.), 125 S. W. (2d) 785; St. Louis-San Francisco Ry. Co. v. Williams, 180 Ark. 413, 21 S. W. (2d) 611; St. Louis-San Francisco Ry. Co. v. McClinton, 178 Ark. 73, 9 S. W. (2d) 1060; St. Louis-San Francisco Ry. Co. v. Horn, 168 Ark. 191, 269 S. W. 675; Bradley v. Mo. Pac. Railroad Co., 288 Fed. 484.] Recent Arkansas cases applying this rule to particular facts have not produced unanimous decisions. [Mo. Pac. Railroad Co. v. Price (Ark.), 133 S. W. (2d) 645; Mo. Pac. Railroad Co. v. Davis (Ark.), 125 S. W. (2d) 785; C., R. I. & P. Ry. Co. v. Tankersley, 195 Ark. 365, 113 S. W. (2d) 114; Mo. Pac. Railroad Co. v. Sanders (Ark.), 106 S. W. (2d) 182; Mo. Pac. Railroad Co. v. Brewer, 193 Ark. 754, 102 S. W. (2d) 538.] However, we must take the majority view of these cases as the law of Arkansas.

In the Davis case, supra, the train involved was running 70 miles per hour near a small town. The plaintiff was driving north on Highway No. 64. Woods south of the track, 600 feet east of the

crossing, prevented the driver, plaintiff's son, from seeing the train (or the trainmen from seeing them) for more than 800 feet, until the truck was within 100 feet of the crossing. "The grade of the crossing was almost negligible." At 50 feet, there was a clear view east for 2500 feet. "The speed of the truck was reduced to from 5 to 10 miles per hour as they approached the crossing." The men looked west, because they saw smoke in the town they had just left and knew a train was switching there, but did not look east until the train was upon them. The fireman "testified that he thought the truck would stop," and "when he saw the truck was about to cross, there was nothing he could do except warn the engineer . . . who immediately blew two short blasts of the whistle and applied the emergency brake" as the collision occurred. Plaintiff's evidence showed that no prior signals were given.

In holding that "the trial court should have told the jury, as a matter of law, that the negligence of the plaintiffs was not of less degree than that of the railroad company," the court said:

"We have, therefore, a case which it appears that the jury found that there was negligence on the part of the railroad company in the failure to give warning of the approach of the train to the crossing; but it appears to be utterly unreasonable to say that this negligence was comparable to that of the plaintiffs, or that the jury was warranted in finding that the plaintiffs' negligence was of less degree than that of the railroad company. . . .

"The only reasonable inference that can be drawn from their conduct is that they did not look, or, if they did and saw the train, deliberately took the chance of beating it over the crossing. If the former, they were guilty of gross negligence—if the latter, gross recklessness. If the parties driving automobiles persist in gambling with death at railroad crossings, their estates should not be augmented by damages if death win. Care, not chance, is the requisite at railroad crossing. . . .

"A mere glance to the east would have revealed the approach of the train in ample time to have stopped the truck, and the only excuse offered for not looking in that direction was that smoke was seen to the west, but the undisputed testimony is that this smoke was in McCrory, three miles west of the crossing. Under the circumstances, it is not merely to split hairs, it is to trifle with the testimony, to say that the jury was warranted in finding that the negligence of the plaintiffs was of less degree than that of the railroad company."

Some recent Arkansas cases have held there was a jury issue as to whether the plaintiff's negligence was less than that of defendant, where the driver stopped, looked and listened before going on the track; but because of obstructions did not see the train which came at high speed and struck his car before he could cross after starting from a stop. [Mo. Pac. Railroad Co. v. Yelldell (Ark.), 133 S. W.

718

(2d) 642; Mo. Pac. Railroad Co. v. Troy (Ark.), 128 S. W. (2d) 1002 (injury to property and not under comparative negligence statute); Mo. Pac. Railroad Co. v. Lemons (Ark.), 127 S. W. (2d) 120 Mo. Pac. Railroad Co. v. Harden (Ark.), 125 S. W. (2d) 466; Mo. Pac. Railroad Co. v. Byrd (Ark.), 117 S. W. (2d) 344.] There have also been recent Arkansas cases, which held there was a jury issue on comparative negligence, when the driver did not stop, where a train at night was without a headlight (Mo. Pac. Railroad Co. v. Richey (Ark.), 132 S. W. (2d) 806; C., R. I. & P. Ry. Co. v. McKamy, 180 Ark. 1095, 25 S. W. (2d) 5); or where it was misty, rainy or foggy (St. L.-S. F. Ry. Co. v. Hovley (Ark.), 137 S. W. (2d) 231, 120 S. W. (2d) 14; Hovley v. St. L.-S. F. Ry. Co., 102 S. W. (2d) 845; L. & A. Ry. Co. v. O'Steen, 194 Ark. 1125, 110 S. W. (2d) 488). This court has reviewed cases of other special circumstances in Mosley v. Thompson, 143 S. W. (2d) 310, and Barnes v. St. L.-S. F. Ry. Co., 338 Mo. 497, 92 S. W. (2d) 164. However, we are cited no case, and find none, holding that the negligence of the railroad could be found greater than that of a driver under such circumstances as here, where the car was only slowed down, and thereby made the reasonable appearances of the situation such that it looked like he would stop before reaching the crossing. On the contrary, in the Davis case, the court said of such circumstances: "All the testimony is to the effect that the speed of the truck was being reduced, and the fireman had the right . . . to assume that the driver . . . would in fact stop." The court there ruled that "There was no testimony to support the finding that due care had not been used after discovery of the peril." No such charge of negligence was even pleaded in this case.

This is a case of good weather and daylight sunshine. It is true that there is evidence here of brush and weeds in the right of way but these were not shown to have been close to the crossing, nor was it shown that the higher bushes anywhere formed a solid obstruction. (Since the trainmen could see cars south of the switch track.) Certainly, if they did make a solid obstruction anywhere, the driver (and deceased) were just as negligent in driving upon the track without stopping, or looking again, if they could not see that the track was clear from the point where they slowed down, as if they had failed to look at that point. Surely it is very negligent to drive on to a railroad track without being able to see that it is clear. In Missouri Pacific Railroad Company v. Brewer, 193 Ark. 754, 102 S. W. (2d) 538, where the driver testified that he stopped, looked and listened "in the approach to the crossing," the court said: "It is significant that he failed to say he continued to observe this precaution after he started to drive upon the crossing. He failed in his duty in this. One must not only look and listen, but continue to do so until the point of danger has been passed." Also in holding a driver's negligence equal to that of defendant, in Missouri Pacific

Railroad Company v. Price (Ark.), 133 S. W. (2d) 645, the court said of a driver who went on the track when his view was obstructed, that he "must have relied upon his sense of hearing in preference to his sense of sight." The evidence in this case shows that, when deceased and his son looked to the east, they did not use due care to look at the proper angle to see down the track. The physical facts show this because they also show that, at least 40 feet south of the track, they did have a clear view east for almost a quarter of a mile, except for weeds and brush which could have only partially interfered with a full view. The train must have been a very few hundred feet from the crossing when their car was slowing down between the two tracks, and it must have been very close when they started up again. According to defendant's evidence, before they reached the switch track, they passed a car which had stopped for the train, and they faced another car stopped only 40 feet on the north side of the crossing. If this was true (and no one specifically denied it) they had a very apparent warning from these appearances. But, in any event, they had an actual warning in due time from Mrs. Standridge in the car with them to "watch out for the train." Yet the car was so heedlessly started by again, after slowing down in crossing the switch track, and when the train was close upon them, that even the whistle started about 100 feet from the crossing was not in time to cause the driver to stop it. It seems, as also stated in the Brewer case, supra, the driver "apparently concluded that as one car had crossed in safety, he could also, and was negligent." Under all these circumstances, as we understand the Arkansas cases, we must hold that there was no reasonable basis for a finding that the negligence of deceased was less than that of defendant.

Contributory negligence is not a defense if a violation of the lookout statute is shown. [Mo. Pac. Railroad Co. v. Lemons (Ark.), 127 S. W. (2d) 120; Mo. Pac. Railroad Co. v. Nelson, 115 S. W. (2d) 872.] However, we can find no evidence to warrant the submission of failure to keep the statutory lookout. It is true that this may be shown by circumstantial evidence. [Mo. Pac. Railroad Co. v. Sanders, 193 Ark. 1099, 106 S. W. (2d) 182; Mo. Pac. Railroad Co. v. Trotter, 184 Ark. 790, 43 S. W. (2d) 762; see also Mo. Pac. Railroad Co. v. Nelson, 195 Ark. 883, 115 S. W. (2d) 872.] However, under the lookout statute, a case resting on a presumption of negligence on the part of appellant's employees is based on a presumption of law and, absent supporting affirmative or circumstantial evidence, the presumption takes flight upon the introduction of substantial evidence contra. [Mo. Pac. Railroad Co. v. Penny (Ark.), 137 S. W. (2d) 934, 936 (2, 3); Mo. Pac. Railroad Co. v. Moore (Ark.), 138 S. W. (2d) 384, 386 (3); St. Louis-San Francisco Ry. Co. v. Hovley (Ark.), 137 S. W. (2d) 231, 233 (6); Mo. Pac. Railroad Co. v. Ross (Ark.), 133 S. W. (2d) 29, 30 (2).] It has been held that a contrary con-

720

struction would violate the due process clause of the Fourteenth Amendment to the United States Constitution. [Oxford v. St. L.-S. F. Ry. Co., 331 Mo. 53, 52 S. W. (2d) 983; Mo. Pac. Railroad Co. v. Ross (Ark.), 133 S. W. (2d) 29; and cases cited; Mo. Pac. Railroad Co. v. Hovley, supra.] Plaintiff's argument is that "the peril of the Standridge car was discovered by Keatin (head brakeman) as it approached the crossing but no warning was ever given to the engineer;" and that "this fact, alone, precludes appellant from successfully contending that the lookout statute was not violated." But here the engineer also testified "that the head brakeman was sitting up there in front of (the) fireman, looking ahead." Moreover, even plaintiff's evidence showed that the engineer did whistle just before he reached the crossing, which was sufficient reason to explain why the brakeman would not tell him to whistle after he saw the car would not stop. The brakeman's testimony has been set out. He said it looked like the car would stop until the engine was within 20 or 30 feet of the crossing and under plaintiff's evidence it must have been whistling then. This, considered with other testimony, may show error of judgment as to what the driver of the car would do but it does not show failure to keep a constant lookout. [Jemell v. St. L.-S. W. Ry. Co., 178 Ark. 578, 11 S. W. (2d) 449.] Furthermore, it is to be noted that the brakeman's testimony corresponds with that of Vinson as to the car slowing down as it approached the crossing. The train must have been very close to the crossing when the car "started up again," and plaintiff's own evidence shows a whistle starting 100 feet from the crossing. Plaintiff also says that the brakeman's position obstructed the view of the fireman. Even if it did, nothing obstructed the brakeman's view and we are cited no authority, and find none, holding that there must be more than one trainman keeping a lookout on each side of the engine. This is also true as to plaintiff's argument about trainmen on the caboose failing to keep a lookout ahead of the engine. [See Kirkdoffer v. St. L.-S. F. Ry. Co., 327 Mo. 166, 37 S. W. (2d) 569.] Plaintiff further argues, because the engineer said if he had put on the emergency at 200 feet east the train could have been slowed to 20 miles per hour at the crossing, that this shows that men on the left side could have prevented the collision by earlier warning to the engineer, and that this shows neglect of their duty, which is evidence of failure to keep a lookout. However, this statement was based on defendant's evidence of a speed of 35 miles per hour and to accept that would be contrary to plaintiff's evidence and theory, and would take excessive speed out of the case. This shows nothing about what would have happened at the speed upon which plaintiff's case was based. Even as to the speed to which it was applied it leaves to speculation and conjecture any finding that such slackening would have avoided the collision, since this car was hit enough in front of center to throw it to the

south side of the track. [Sevedge v. K. C., St. L. & C. Ry. Co., 331 Mo. 312, 53 S. W. (2d) 284; State ex rel. Baldwin v. Shain (Mo.), 125 S. W. (2d) 41; State ex rel. Banks v. Hostetter, 344 Mo. 155, 125 S. W. (2d) 835.] Furthermore, the fireman's testimony was that when the engine was 200 feet from the crossing the car was slowing down, and this slowing is corroborated by all of plaintiff's evidence. Soon after that there was nothing to do but whistle. There was a whistle before the crossing was reached and as one of plaintiff's witnesses said: "Just after the whistle blowed the crash was on." We must hold that these circumstances do not show failure to keep a lookout.

The judgment is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.