SOUTHWESTERN BELL TELEPHONE COMPANY *v.* McADOO.

Opinion delivered October 22, 1928.

*Elmer S'choggen* and *Edward B. Downie,* for appellant.

*W. R. Donham,* for appellee.

MEHAFFY, J. The appellee brought suit in the Saline Circuit Court against the Southwestern Bell Telephone Company, to recover damages for an injury alleged to have been caused by the negligence of the telephone company.

Appellee had a telephone in his front room, and had got up to get the baby a drink of water; had the baby in his arms, and was standing under an electric light drop, and was about 15 or 16 feet from the telephone instrument. Appellee alleges that a flash of lightning came, and he was knocked down. It is claimed that the lightning came in through the telephone instrument and struck McAdoo, and that it was because the telephone company had negligently and carelessly failed to use ordinary care in installing the telephone, in that it adopted no precautions to prevent charges of atmospheric electricity entering appellee's residence, and that it failed to use known and approved appliances and devices to prevent such occurrence. Appellee also alleged that the telephone company negligently and carelessly failed to ground its telephone wires, or, if grounded at all, they were grounded in a careless and indifferent manner, in that no iron rod was driven into the ground and the wires attached thereto.

Appellant denies all the material allegations of the complaint, and alleges that, if appellee was injured as claimed, it was due to an act of God and causes which appellant could not foresee or control.

The appellee testified, in substance, that he was 43 years of age. He lives in Benton, and works for the railroad company; is a bridge carpenter, and has been with them about two years; makes 67 cents an hour, and works eight hours and a half. He had lived at his present residence since the latter part of the year 1926, but does not own the property. The telephone company

installed a telephone in his residence after he moved there, but he did not see them put it in. There was a very severe storm the night he was injured; it hailed and lightened all night. Between ten and eleven o'clock he got up and put on his clothes, then lay down on the bed. The folks were scared of the storm, so he got up and walked in the kitchen to get the baby some water. He heard something pop, and the lights went out during the flash, and he was knocked out. That was the last he remembers. The lightning seemed to come through the house. There was the popping and then the flash. He was 15 or 16 feet from the telephone, and facing the 'phone the way he walked into the room. There is a door right straight through to the telephone. The lightning came from that direction, from towards the telephone. The telephone fuses were burned out. The batteries were burned out and thrown away. They were taken out next day. They put in new batteries. The injury seemed to paralyze him. When he recovered consciousness he could not talk and could not raise his arm; he was helpless. People were bathing him. He could not control his limbs nor hold his head up. It hurt on the side of his head. That was the worst place. He could not swallow water or anything. It was 40 or 50 minutes before he realized anything. When he regained consciousness he was sitting in the front room in a chair, and the doctor was there; several people were there. He bit his tongue, and it was bleeding. It was next morning before he could swallow, and several days before he could talk. The hurt commenced on the side of his head and went down the back of his neck, and his eyes pained him. He can't see to read; was not troubled like that before the injury. Cannot read an ordinary newspaper. This condition has existed ever since his injury, and he does not seem to get better. Often in trying to talk he tries to say things, and cannot say them right. After the injury he was confined to his home 14 days, and in bed about half that time. He is not now able to do work that requires the use of his eyes like he could before.

His job was lining up the forms, and he can't see to line them up as he could before. Was earning about $5.36 a day; was off 14 days.

He had had a telephone about two years prior to the time he moved into his present home. The 'phone was put in where he now lives about two weeks after he moved there. The house he lives in is about square. The telephone is a wall type. The lights were on when he got the water. His house is lighted by electricity; there is a drop cord with a globe and a snap-off at the end of that. He is five feet nine inches tall; the cord would come down within eight or nine feet of the floor—has about a three-foot cord. The living room is about twelve by twelve; the kitchen is about the same size. There is an electric light drop in the living room and one in the kitchen. The telephone had been working all right when he attempted to use it from time to time before the injury. There was a storm the night he was injured, and a house was struck by lightning across the street. A transformer or some lighting device burned out in his neighborhood, but he did not know where it was located, but several blocks west of the house, not on his street. At the time appellee was injured the lights were out. The lights went out, and that is all he knows about it. It hit him, and he was in bed all next day. The telephone was on the wall in the living room, and he was standing about the center of the kitchen.

Witness came in through the door—came into the kitchen. When he made his turn he would be facing the telephone, because the 'phone is right in front of the door. The light fuses were not burned out. The transformer was fixed next day, and the lights came on. There was nothing done to the lights in the house. The telephone fuses were blown out and the batteries burned out. The telephone line came down the west side of the street across from the house; they were strung on the light company's poles. Appellee was the only person on that street that had a telephone.

Dr. Blakely, physician, testified that he attended Mr. McAdoo, and that he was in a nervous condition, and would have a twisting or jerking of the muscles of the face. His speech was bad. Knew that he had received some kind of shock. Such a shock as appellee received would be produced by a stroke of lightning. At the time he thought that appellee's condition was such as to endanger his life; that he would probably die. He gave him some narcotics to relieve him. Does not think a man that received shock like that would likely stand any severe cold, or hear—doesn't believe his nerves would stand it. Such a shock might affect the eyes.

Nelson McAdoo, son of the appellee, eleven years old, testified, in substance, that he was there when they put in the telephone. He watched the man put it in. When the man was putting in the telephone he just hung the ground wire down the side of the wall; he didn't stick it in the ground; it just hung down there; he did not have an iron rod or anything that he drove in the ground that he attached it to; witness was there when he fixed the telephone after his father got hurt, and watched the man fix it. The man left the house three different times. The last time he came he used an iron rod, and attached the wire to it. He got the iron rod when he went back to the office, and when he got back he drove it into the ground and fixed the wire around it. When the man was repairing the telephone he scratched around to see if there was any ground wire there; he didn't find any; there was none there for him to find. The last time the man was there he said there ought to have been a rod there. He saw him when he went to town and saw him bring an iron rod back. The 'phone was put in over a year ago. The man who put it in and the man who repaired it after his father was injured were not the same. Obie Jones put it in, and then, after his father was hurt, Mr. Hankins came. The man did not tell witness why he put the wire down there. The 'phone was working all right before appellee was injured. The telephone is on the wall in the west end of the living room, and

116

appellee was standing in the kitchen, near the kitchen cabinet, where the bucket of water was kept. There was an electric light globe on a wire hanging down for the electric lights. The lights went out that night all over the neighborhood. Lightning struck a house across the street. Mr. Seville, whose house was struck, did not have lights in his house. Witness noticed one thing about the wiring on the front porch—that they put that little rubber rod that had two wires, one joined on one and one on the other, and now there is just one.

Appellee, being recalled, found there were two wires attached to the plate out on the porch at the time. It was a two-way circuit, and they afterwards changed it and had it one-way. That change was made the 28th of October. He did not see the man making the change. Mr. Boyd ordered the wires taken off of the light company's poles, and next day they were taken off. Mr. Boyd works for the telephone company at Benton. The house that was struck by lightning was about 150 feet away. When the flash came the room was all lighted up. There was a glass window in the kitchen, and it was not broken. There were no boards or anything taken off of the house, and no visible sign of its having been struck by lightning.

Carl W. Alley testified, in substance, that he was an electrician; had been about 24 years; had worked for the Southwestern Bell Telephone Company, and originally installed a good many telephones in Benton. There are two methods of installing a 'phone—the ground circuit and the metallic—one wire and the ground circuit. The purpose of grounding it is that, in a one-way circuit, the earth takes the place of the other wire where you just have one wire. You cannot talk over a telephone with a one-wire circuit unless the wire is grounded. You can talk over a telephone or two-wire circuit when the wire is not grounded. The purpose of grounding the two-wire circuit is for protection from lightning; you are supposed to have a fuse box there, and the lightning comes in and blows the fuse and protects the telephone.

The lightning is supposed to be diverted and go through the wire to the earth, over the ground wire. That is the usual method of installing telephones. Whether you have a one-wire circuit or a two-wire circuit, the rule is to ground them to protect the occupants from lightning. Witness observed the wire on the McAdoo house. He observed the plate on the porch; it is a two-wire circuit —two wires and two fuses; the way it is being used now is one. To change it from a two to a one you put the wire over on that post and then ground the other side of your telephone. The plate originally was a two-wire circuit. There were two wires, but they are twisted together and made one now. That was intended or fixed for a two-wire circuit clear into the house. Other 'phones in Benton have two wires. Does not know of any one-wire circuit in Benton except this one. If lightning should enter the residence over the telephone wires, in some instances it would blow the fuse, in others it would not—lightning plays freaks sometimes. You can't always control it. If the fuses were blown out, it would indicate that lightning had been in there. Never knew of a telephone fuse blowing unless it was lightning that caused it. A fuse is of soft metal. If lightning strikes it, it melts and cuts the current out of the telephone. If the fuses are blown out they break the current in the circuit between the outside wire and the wire leading into the telephone instrument itself. But, at the same time, there might be enough current arc through the fuse and tear up the telephone and still blow the fuse at the same time. If you found the fuse blown, that would show that it functioned, and that a current of electricity had come in there, and that it broke down and had cut the current off from the telephone instrument. All rural telephones are furnished with a ground, and this telephone is working grounded now. If the telephone was working, one wire was bound to have been grounded, but if you had a two-wire circuit there wasn't any necessity of grounding it to make it work. The

wires are now attached to one post. This is all new wire running into there now. The wiring on there is new.

Witness could not say where lightning would come out of a telephone and cross a room 15 or 16 feet. Does not know anything about the conditions at the time Mr. McAdoo was hurt. There is a better chance of lightning not getting in over the wire if it is grounded. If lightning came in through the wall it is likely to leave some sign of it, unless it was conducted in over a wire. Protective devices are not an absolute protection; they are just protective; there is a better chance of saving the telephone instrument if you have it protected. All telephones that are burned out by lightning are not knocked off the wall by it. Sometimes it will knock them off.

Grady Smith testified, in substance, that he is superintendent of the water and light plant at Benton; remembers the storm that occurred at the time Mr. McAdoo was struck by lightning. They have a transformer for their light plant about three or four blocks from where McAdoo lives. During that storm the transformer burned out on the primary side, burned the fuse on the primary side. That was all the damage it did. For electric current from that lightning to be transmitted into the home of Mr. McAdoo, it would have to go through the meter. The meter was not injured. When lightning is transmitted through a meter, it usually burns the potential coil out. If lightning had been transmitted into the house over the light wires, you would expect a blowing of the light fuses. It usually happens if a big bolt comes in, but it doesn't every time. The fuses blew on the transformer; it cut that entire end of town off that was fed from that primary circuit. The lights went off because the primary fuse on the transformer blew. Their primary lines are protected with lightning arresters. The transformer has to transform the high tension current to the low tension.

Florence McAdoo, 14-year-old daughter of appellee, testified, in substance, that she had seen the telephone wires on the outside of the house a few days before

her father was struck; saw the wire that came down outside the house toward the ground. Saw it on Saturday, and it was Monday or Tuesday when her father was struck. When she saw the wire on Saturday it was just dangling down from the side of the house about two or three inches from the ground. She noticed it, and called her mother and asked about it. When her father was struck he could not talk. He bit his tongue, and it was bleeding. The accident occurred between 10 and 11 o'clock. It was days before he talked so you could understand him. He complained of his eyes and his neck hurting. He has not been able to read since the injury. Witness knows about the plate and the wires, and that there was one wire going to each one of those. That was the condition of them at the time of the injury. They are not in that condition now. The difference is that both of those little wires go to one of those rubber things. It is attached to one post instead of two. The 'phone is still in the house. After they fixed it next morning it worked all right. There had been no trouble with it before the injury. There was a good deal of lightning and thunder that night. The kitchen is near the living room. There is an electric light in the kitchen, on a cord. The lights were on at the time, but when that clap of thunder came they were all out. They went out just at the time he fell. The noise was just like thunder. It lighted up the house. The telephone is in the front room. Witness' father had the baby in his arms, and it was not hurt. Witness was there when the man came to repair the telephone, and helped him, rang the 'phone for him. Saw him when he was making the repairs. He drove a rod down in there and connected it with that wire that was dangling down. It was dangling down at the side of the wall when he came to repair it. It was not attached to anything before he came. He made three trips down that day, and the last time he came he brought the rod. He drove it into the ground and attached the wire to it. He felt around down there, and was looking around, and saw there was not any rod.

Pete White testified, in substance, that he lived across the street from McAdoo, and heard Mrs. McAdoo screaming, and went over there. Stayed there about a minute, and went for the doctor. His wife attempted to use the 'phone, but could not get central. All the time he was there McAdoo was unconscious; unable to use his limbs, arms, feet or legs.

Robert Land testified, in substance, that he saw McAdoo in his home the night he was struck by lightning. He took some kerosene lamps, and when he got over there McAdoo seemed very nervous. There is a difference in McAdoo's speech now and before the injury.

The defendant introduced O. F. Jones, who testified, in substance, as follows: Had worked for the telephone company about 17 years; worked in Benton; repaired trouble, and installed telephones. Installed the telephone in the residence of McAdoo in August, 1926. It was a regular standard telephone. Put in the standard wire—twisted two-wire drop. That goes from the cable up to the house. The cable is not on the electric light pole. Witness put a protective device on there—what is commonly called a No. 12 type protector. It is located right at the point of entrance—on the porch. The wires go through the wall into the room and fasten to the telephone. It had a standard ground rod, one-half inch in diameter by five feet long, and that had attached to it No. 14 wire from the protector leading from the protector to the ground rod. The rod was driven down in the ground. The purpose of the ground rod is for protection. The 'phone was working on one wire; had to use the ground for return to complete the circuit. They did that because of the shortage of facilities out there at that time. The difference between a metallic circuit and a ground circuit is that a metallic circuit has two wires. The telephone would not work if there had not been a ground wire on it. Does not know if it is still working grounded. Knows that is the way it was installed. Most of the telephones in Benton are metallic—that is, have two wires. Has not seen this 'phone since

the time McAdoo was hurt. He ran two wires into the house, but only used one. All telephones in Benton were not two-wire circuits at that time; ran two wires in because it comes a twisted pair of wires. Witness did not wire the house next to Mr. McAdoo. There was no telephone close to this. When he put in McAdoo's telephone, there was no 'phone right near him that he knew about. The proper thing to do in grounding a wire is to put down the ground rod. It is a half-inch rod about five feet long. You drive it all the way up in the ground and then attach the wire to it. Witness did not repair the 'phone after it was blown out; was working at Malvern. Knows he installed the telephone. It is a matter of record. At the time that telephone was put in there they had a cable pair. They ground them all. It is necessary to ground them as a matter of protection. Has not been in McAdoo's yard since he installed the telephone. Did not go back to drive in the rod. He put it in when he put the telephone in. When he put the 'phone in, he did not have an available pair. One side is open. They would use only one side of the pair. All the rest of the pairs were in use to serve other subscribers, so there wasn't a pair available for McAdoo. He therefore put him on a ground circuit. The record shows installation completed on August 11. A little flash of lightning may blow a fuse. The purpose of the fuse is to protect the premises and the telephone. The current, instead of going through the telephone, will go to the ground. Lightning or any current of electricity will seek the shortest path to ground. If lightning goes past the protector, it is liable to tear the telephone up and burn the wires out of the 'phone. The best device for protection against lightning is a protector properly grounded. Where they have that device, they do not expect damage to occupants inside a room from strokes of lightning.

D. M. Hankins testified, in substance, that he was out at McAdoo's house next morning after he was injured. Found one of the fuses blown—the protector on

the telephone. He replaced it with a new one. The 'phone was not working when he went out there. It did not work when he replaced the fuse. The best he can remember there was something the matter with the cable pair, and he had to change that. The way he found it, the telephone was working what they call grounded. There were two drop wires that ran in there. That is what they call parallel wires. This 'phone had a ground wire on it.

This witness was asked if he did not state in the presence of others, naming them, that that was the cause of the trouble; that it had never been properly installed, and that the rod was not there. He said he did not.

Mr. Seville testified about the storm, and the lightning striking his house.

Mr. Best testified that he is an electrical engineer, and is employed by the Arkansas Light & Power Company. Examined the McAdoo premises, and found they had a standard lightning arrester protector of twelve gauge, with two fuses, and with a ground wire and a ground rod—standard ground rod and ground wire. It was necessary to have a ground wire and a ground rod to operate the 'phone—otherwise it would not work. If the fuse was blown out, that would indicate to him that the protector was performing properly. If it went into the house with sufficient force to knock McAdoo down when he was 15 or 16 feet away from the instrument, it would have left some effect on the instrument. It would show some smoked place on it. Basing his answer on his experience and technical knowledge in connection with the matter, it would not be possible for lightning to come in on a 'phone without leaving some effect. Does not consider it probable that lightning jumped that far from the telephone. Assuming that the lightning came in over a wire at all, he thinks it came in over the electric wire. If the telephone was installed without a ground piece to which you attach a ground wire, it was not properly installed, and it wouldn't work, assuming it was a one-wire circuit. A two-wire circuit will work

without a ground wire. If a bolt of lightning passed through a meter, it would not necessarily burn that out. It would burn out the current coil. It would not necessarily burn out the light fuse. Thinks that, if the lightning came in the house on any wire at all, it probably came in on the electric wire.

Mr. Drees testified that it was his opinion that the lightning came in over the light wire, and, assuming that there was no ground wire, lightning would have gone into the 'phone and shown some evidence of it by the condition of the 'phone. He did not examine the 'phone. He is president of the Arkansas Electric Company, a firm selling electrical wiring and electrical supplies.

Witness was then asked, assuming that he examined the telephone the morning after McAdoo was injured and found that the light meter was not molested—that it was in good condition, not damaged in any way, and the light fuse not molested; that it was in good condition, and not damaged in any way—then, after he found that the telephone apparatus had no ground wire and the telephone fuse had been blown, if lightning was conveyed into the building over either sets of wires. Witness said that he would assume that some slight charge did perhaps come in over the 'phone wires. As you relate, there is no evidence shown of its coming in over the electric light wires, though it might easily have done so.

Mr. Ettinger testified, in substance, the same as the other witnesses about the installation of the telephone and about the lightning coming in over the light wire instead of the telephone wire.

We have copied enough of the testimony to show that it is conflicting on the question of how the telephone was installed—whether properly done or not—and we deem it unnecessary to set out more of the testimony.

The appellant submits four reasons why the case should be reversed. The first is that the alleged negligence on the part of the appellant in failing to install a

protective device and grounded rod wire was not proved. Both Nelson McAdoo and Florence McAdoo testified to facts showing that it was not grounded; that there was no rod there; that the man who repaired the 'phone after the injury brought a rod with him and drove it in the ground; that he looked around there and found none, because there was none there.

While this testimony is contradicted by the witnesses for the appellant, it is sufficient evidence to submit to the jury the question of whether the instrument was or was not negligently installed. This court has many times held that, where there is any substantial evidence to sustain the verdict of the jury, the verdict will not be disturbed, although this court might think that the weight of the testimony was the other way. This court does not pass on the credibility of the witnesses nor the weight of their testimony.

The next contention of appellant is that the verdict of the jury is not based on any testimony as to how the lightning entered the house, if at all. We do not agree with the appellant in this contention. Appellant argues that there is doubt about the lightning entering the house at all. There is no contradiction about this at all, and several witnesses testified that it did enter the house. But how did it enter the house? It would be physically impossible for it to come through the wall of the house, or to come into the house without making some sign on the walls or window, if it came in through a closed window, unless it came over the electric wire or the telephone wire. It therefore must have come over one or the other.

The evidence conclusively shows that, while the electric lights went out at the time the lightning came in the house, it was because a transformer some blocks away was injured; and when this transformer was repaired the lights immediately went on in the house, and there was therefore no injury either to the wires entering the house or to the globes, and no part of the apparatus was affected in any way.

On the other hand, it is undisputed that the telephone was injured and had to be repaired before it could be used, although it was in perfect order before the lightning came into the house. We are of opinion that this was sufficient evidence to submit to the jury the question of whether it came in over the electric light wires or the telephone wires; that is, it is sufficient to submit to them the question whether it entered the house because of the negligence of the defendant in failing to properly install the telephone.

The appellant quotes from authorities that the proof of an alleged act or omission, as causing injury, is not sufficient to establish it as the cause so long as other causes existed and were present which might as well have caused it. This is unquestionably a correct statement of the rule. The jury will not be permitted to surmise or conjecture, because surmises and conjectures cannot supersede or take the place of proof. But we think the proof in this case shows that there were no other causes present which might have caused it. We think it is conclusively shown that it did not come in over the electric wires. To be sure, the jury is not allowed to indulge in presumptions. There must be proof. And, if it were merely matter of conjecture, it would not be sufficient to sustain the verdict.

We also agree with appellant that it is not with defendant to account for the accident. But when evidence has been introduced, as it has in this case, showing that the defendant was negligent in installing the instrument, and also proof that the electric wires were in perfect condition after the storm, the conclusion is inevitable that the lightning came into the house over the telephone wire.

It is next contended by appellant that there is no evidence that the appellee was "struck by lightning," and appellant argues that lightning always leaves its mark on any object, animate or inanimate. The lightning came into the house, and, as it came in, appellee was knocked down. Nobody pretends that there was

any other force to knock him down, and, whether there was any mark where it struck him or not, we think that the proof shows the lightning struck him. There is no conjecture, speculation or guess about it, but the proof clearly shows that the appellee was struck by lightning. If appellant had proved that one could not be struck by lightning without there being some marks on the person, there might be some basis for making this argument. But when all the proof shows that appellee, when the lightning came, was knocked down, and his condition thereafter such as it would be, as the doctor testified, by receiving a shock from lightning, we think this contention of appellant is without merit.

Appellant's next contention is that the court erred in permitting appellee to prove that witness Hankins admitted that the telephone was not properly grounded, and that this was the cause of the injury. This is not evidence of a collateral matter. Hankins was there for the purpose of repairing the telephone after the injury.

In appellant's motion for a new trial it states that the court erred in permitting the witness Mrs. Florence Griffin to testify that D. M. Hankins, an employee of defendant, after the accident occurred, made an admission that the defendant's telephone was not properly grounded, and that, by reason of this, the accident of plaintiff occurred, over the objections and exceptions of the defendant, and that the court erred in refusing to exclude this testimony.

There is no effort to bind the company because of Hankins being a general agent, but he was a witness in the case, and, like any other witness who testifies in a case, it was competent to ask him if he did not make certain statements which, if made, would impeach his testimony at the trial, or would tend to discredit him. The testimony was only admissible as to his credibility, but there was no request made by appellant to limit this testimony to the credibility of the witness. We think it was admissible for this purpose.

Our statute provides that "a witness may be impeached by the party against whom he is produced by contradictory evidence by showing that he has made statements different from his present testimony." Section 4187, C. & M. Digest. See *Eureka Oil Co.* v. *Mooney*, 173 Ark. 335, 292 S. W. 681, and cases cited.

Since evidence of statements of the witness made at a different time was proper by way of impeachment, a general objection to his testimony was not sufficient. The appellant might, by proper request, have had this testimony confined in its application to the credibility of the witness. If such request had been made, the court would doubtless have instructed the jury that this testimony was admissible for no purpose except as it might affect the credibility of the witness.

We think the evidence in this case was sufficient to submit the question of appellant's negligence to the jury, and also the question of whether appellant's negligence, if the jury found it negligent, was the proximate cause of the injury, and, if there is any substantial evidence upon which to base a verdict, it will not be disturbed by this court.

"The liability of a telegraph or telephone company for personal injuries is governed by the principles applicable in the case of electric companies generally. Such a company is clearly liable in damages for injuries proximately resulting from the failure to exercise the proper degree of care, to those to whom it owes the duty of such care, but it is not an insurer, and will be liable to respond in damages only where the company or its employees have been negligent, and the injury complained of was the natural and probable consequence of such negligence. Negligence of such a company may be the proximate cause of an injury even though there may be an intervening cause, such as negligence of another, which, though not anticipated, would not have occasioned the injury except for the earlier negligence." 26 R. C. L. 529.

"But whether or not the defendant company has been negligent in the erection and the maintenance of its poles, wires and plate, is one for the proper determination of the jury upon the facts of the instant case, unless the negligence is so clear upon the evidence that intelligent minds cannot form different conclusions upon it. Thus, for instance, the extent to which wires conveying deadly electric currents should be insulated or otherwise guarded must be decided by the jury under the facts of each case, as must the question whether a company has furnished proper safety devices, and properly connected the same, upon installing its instruments, and whether it has performed its duty as to inspection and repair of its appliances." 9 R. C. L. 1227.

That the appellant's wires conveyed deadly electric currents is not disputed; that is, that it would do so. And, under the authorities, it was a question for the jury whether its instruments were properly guarded and insulated; whether it used proper safety devices, and properly connected same.

The proof in this case is conflicting on the question of whether there was a rod in the ground and a ground wire. There is, however, no dispute about the question, if it was installed in the manner that the plaintiff's witnesses testified that it was, a ground wire was required for protection, but that it was not required in order to be able to use the telephone. It is conceded by appellant, however, or rather appellant's witnesses testified, that this grounding of the wire is for protection so that the lightning coming in over the wire, if any should come in, is carried to the ground, and that this is the proper way to install it for the purpose of protection. It is true there is a conflict about whether the company was negligent in this regard, but that conflict was for the jury to settle.

It has been said:

"It is error to grant a nonsuit because the facts testified to are incredible and impossible, when it is not shown by science and common knowledge that the tes-

timony—the case involving electrical phenomena—is false, and, according to some authorities, a verdict cannot be directed for the defendant in such an action, although its evidence is uncontradicted and sufficient, if true, to overcome the *prima facie* case made by the plaintiff. * * * The question whether or not the negligence of the defendant was the proximate cause of the injury is also one for the jury, where the evidence is not clear, or the proper inference from undisputed evidence may be in doubt." 9 R. C. L. 1227-8.

This court quoted with approval from the court of Texas Civil Appeals as follows:

"The duty resting upon telephone companies to adopt precautions for preventing charges of atmospheric electricity from entering buildings over their telephone wires is thus stated by the Supreme Court of Vermont: 'Having undertaken to place and maintain the instrument in the house and connect it with its telephone line for the use of the deceased, in so doing it was under the duty to exercise the care of a prudent man under like circumstances. If, while in the exercise of such care, it had reasonable grounds to apprehend that lightning would be conducted over its wires to and into the house, and there do injury to persons or property, and there were known devices for arresting or dividing such lightning, so as to prevent injury therefrom to the house or persons therein, then it was the defendant's duty to exercise due care in selecting, placing and maintaining, in connection with its wires, such known and approved appliances as were reasonably necessary to guard against accidents that might fairly be expected when conducted to and into a house over its telephone wires'." *Southwestern Tel. & Tel. Co.* v. *Abeles,* 94 Ark. 254, 126 S. W. 724, 140 Am. St. Rep. 115, 21 Ann. Cas. 1006.

The court then cites the following authorities to the same effect: *Griffith* v. *New England Tel. & Tel. Co.,* 72 Vt. 441, 48 A. 643, 52 L. R. A. 909; *Southwestern Bell Tel. & Tel. Co.* v. *McTyer,* 137 Ala. 601, 34 So. 1020, 97 Am. St. Rep. 62; 1 Joyce on Electrical Law, § 445F;

*Rural Home Tel. Co.* v. *Arnold,* 119 S. W. 811; *Southwestern Tel. & Tel. Co.* v. *Bruce,* 89 Ark. 581, 117 S. W. 564.

While the appellant objected to some of the instructions given by the court, these objections are not urged here, and are therefore abandoned. The court however fully and, we think, fairly instructed the jury, and, while the evidence may be slight, we think it was sufficient to submit the questions to the jury, and the jury's finding on questions of fact is binding here.

The judgment is therefore affirmed.

Mr. Justice McHANEY dissents.