MISSOURI PACIFIC RAILROAD COMPANY v. PRICE.

4-5672      133 S. W. 2d 645

Opinion delivered November 27, 1939.

Henry Donham, for appellant.

J. H. Lookadoo and Tom W. Campbell, for appellee.

Griffin Smith, C. J. The appeal is from a $20,000 judgment to compensate personal injuries alleged to have been sustained by appellee as the result of a crossing collision. It is disposed of by holding that appellants were correct in their contention that there should have been an instructed verdict for the defendants.

The evidence discloses a situation which enjoined upon the trial court the duty of holding, as a matter of law, that plaintiff's negligence was equal to or greater than that of the railroad operatives.[1] The case is controlled by Missouri Pacific Railroad Company v. Davis.[2]

1 Pope's Digest, § 11153.
2 197 Ark. 830, 125 S. W. 2d 785.

Appellee, 47 years of age, had for more than ten years been secretary-treasurer and general manager of a wholesale grocery business at Pocahontas. After attending a stockholders' meeting the night of January 21, 1938, he went to a picture show and got Vina Davis, and the two, in appellee's automobile, proceeded to a resort a short distance east of Hoxie described by witnesses as a honky-tonk,[3] where merrymaking was somewhat unrestrained. Dancing and other forms of entertainment were engaged in. Appellee, although married, was not living with his wife.

About one o'clock in the morning appellee and others began leaving the rendezvous. For reasons not pertinent to this opinion appellee did not take the Davis girl home, but after having spent fifteen minutes trying to get his car key out of the lock of the door, (a task he was unable to complete without assistance) he drove off alone. Some of his witnesses say he was traveling 40 miles an hour when he approached the crossing, and that he did not decrease this speed. Others are more conservative. Appellee says he left his companions and traveled at a "moderate" rate of speed, perhaps 20 miles per hour. The highway is east and west. The railroad is north and south. The crossing is near the depot. As appellee neared the railroad two or three automobiles were coming in his direction. His testimony is that "their lights were in front of me." There is this statement: "I continued to look and listen for trains at both ends of the railroad and on both sides of the highway until I was practically on the crossing. One car passed going in the opposite direction and just got across the track as I drove on. It was traveling east on the south side of the highway, and I was traveling west on the north side. I was nearly on the track at the time."

Appellee insists that he hadn't seen or heard the train; that "if there were any lights of a train shining over the crossing it was a mighty dim light."

Other witnesses for the plaintiff described the train's headlights as "dim"; or "I didn't see any"; or used terms of similar uncertainty.

[3] Webster's dictionary defines "honky-tonk" as "a low drinking resort."

On cross-examination appellee testified that the windows in his automobile were all up [closed]; that they were frosted with [appellee's] breath on the inside of the coupe and with the mist on the outside; that if his windshield wiper was working he didn't have it turned on.

Appellee was cross-examined about statements he had made to appellants' claim agent, but vigorously denied all admissions that were in conflict with the theory upon which the suit was being tried. The statement was dated February 25, 1938. At that time appellee was in his office. In it appellee was quoted as having said he drove to within about ten feet of the track and stopped and looked both ways; that he saw the "red flasher signals going on and off, but did not see or hear any train; and then proceeded upon the track."[4]

It is conceded that there were no permanent impediments on or near the railroad to obstruct a clear view of the crossing; that no faulty construction or negligence in maintenance contributed to the transaction; and photographs indicate the terrain was virtually level where the highway crosses the railroad.

Although statements ascribed to appellee in a report compiled by an agent named Jones are vigorously denied, appellee admitted authorship of a letter dated March 21, 1938, in which he said:

"Mr. Jones called on me about three weeks ago, and I gave him, to the best of my knowledge, the facts as [they] happened, . . . The amount I asked for in my satement to Mr. Jones was a reasonable amount."

In the statement, admitted as evidence after objections had been withdrawn, appellee proposed a settlement as follows: ". . . difference [on automobile] $677.40; total hospital, doctor, and ambulance bills, together with $50 as cost of a set of false teeth knocked out; one watch, $45; one pair of glasses broken, $25; room rent at $16 per month for the time I am unable to work, which is yet undetermined. . . . Approximate total, $829.40. plus hospital bills, etc."

---

4 The "red flash signals" referred to are the automatic lights of the block system which give warning that, presumptively, a train is approaching the crossing.

When asked about the statement, appellee said: 'I told him [the account was] for settlement of the automobile, but I didn't tell him [it was in] full settlement of the claim.''

The first paragraph in appellee's letter of March 21st is: ''It has been over two months now since a claim was called to your attention regarding an accident which occurred to the writer January 21, 1938. You sent me a letter on February 17th advising that a claim agent would call on me for the purpose of checking into the matter of whether or not I have a claim.''

The injuries alleged were: ''Left cheek bone and left jaw bones were broken; face and left eye were severely bruised, contused, and crushed; left eyebrow was split, lacerated and contused; five ribs on left side were broken; pelvis bone was broken and shattered in several places; was caused to spend many weeks in clinics and hospitals.'' Appellee's physician testified that he had two ribs broken, and that he sustained some of the other injuries enumerated. He mentioned one or two additional injuries, and estimated the patient's disability was 11 or 12 per cent.

Appellee testified that he ''got hurt slightly'' in a railroad crossing accident and sued the Frisco system in a Missouri court for $7,500. In that case he was hit by a train at Pocahontas. The ''slight'' nature of the injuries alleged is shown in the margin.[5] In spite of the fact that the suit was tried and lost on the complaint and evidence, appellee denied knowledge of the allegations. When asked if he claimed ''all of those injuries in that lawsuit,'' the reply was that he did not.

---

[5] Allegations in the suit prosecuted in Missouri were: ''Plaintiff states that as a result of said collision he was greatly and permanently injured as follows: Spine, and the vertebrae thereof, sacrum and coccyx were partially and permanently rotated, sub-luxated, dislocated and the nerves leading therefrom to plaintiff's vital internal organs, bowels, kidneys, bladder, were crushed, impinged and permanently injured, crippled and diseased and their functions and usefulness permanently impaired; that said organs became weakened, diseased, and their functions and usefulness permanently impaired. Plaintiff's sciatic nerve became impinged, weakened, diseased, and its functions and usefulness permanently impaired and, as a result thereof, plaintiff has and in the future will continue permanently to suffer with sciatic; that plaintiff's spine by reason of said injuries is permanently injured, weakened, and disfigured and its functions and usefulness are permanently impaired. Plaintiff's nervous system was greatly shocked and permanently injured. The bones of plaintiff's left foot were dislocated and permanently injured, crippled, diseased, and their functions and usefulness permanently impaired and plaintiff's entire foot was then and thereby permanently injured.''

There is the additional statement by appellee: "I have had other automobile accidents a few times." They were of a comparatively minor nature.

The engineer testified that he had applied the brakes for a station stop, and had slowed to perhaps 20 miles per hour. When within 100 feet of the crossing he saw an automobile cross in front of the engine. Another was close behind. The second car drove up to the crossing and stopped.—"When it stopped I released the brakes, and just about the time the pilot was reaching the crossing, the car that had stopped on the highway was moving ahead and the car and the engine came together on the crossing. The car had very bright headlights. I could see [it] plainly. He was possibly 200 feet from the track when I first saw him. . . . He slowed down, and when he got pretty close to the crossing I didn't know whether he was going to stop or not; I thought maybe he would follow the other man across; but he slowed down and stopped, and I released the brakes. I thought he came to a complete stop. After it appeared to me that he was going to stop, and didn't, then I couldn't stop. . . . It looked to me like he had stopped dead still. . . . When I saw him start forward over the crossing I put the brakes in emergency. I put on all the braking power I had."

Other witnesses corroborated the engineer in respect of speed, headlights, etc.

In spite of the fact that appellee—a married man with three children—was patronizing a honky-tonk at one o'clock in the morning with a girl companion; that he "hadn't been going with her very much"; that his own witnesses testified he drove over the crossing at a speed of forty miles an hour; that disinterested witnesses affirmed the train bell was being rung and the whistle blown; that others said they saw the signal lights burning—regardless of contradictions and denials in appellee's testimony and the reasonable construction to be placed upon other evidence—in disregard of every syllable of evidence adduced in behalf of appellants, we must say that "substantial" testimony was introduced in

support of appellee's contentions, and under our superior system of jurisprudence it was for jurymen to resolve these conflicts as their reasonable judgments suggested, under instructions of the court that a verdict could only be returned if supported by a preponderance of the testimony. The verdict, having been for the plaintiff, should have been set aside by the trial court if the quantum of evidence—a preponderance—was lacking.

We must indulge an additional assumption: that the court thought the evidence preponderated in favor of the plaintiff.

We reverse only for errors of law, the jury being the sole judge of factual matters, and of the credibility to be given the testimony of witnesses. If there is substantial evidence to support the jury's findings, and no errors of law appear, we do not reverse because, in our judgment, there is not a preponderance of evidence in favor of the verdict.

In the instant case, therefore, we must assume that the bell was not being rung; that the whistle was not blown; that the flash light system (through some mysterious caprice of mechanics) had suspended operation; that the engine headlight was dim; that appellee slowed to a speed of 15 or 20 miles an hour as he crossed the tracks; that he looked and listened, and did not see a train nor hear a signal, and that, having thus reassured himself, he proceeded upon the track at the very instant a passenger engine (which the undisputed evidence shows was not traveling more than 20 miles an hour) engaged the crossing.

The circumstances suggest the questions: "Why did appellee not see a train so obviously present? Was it because the bell was not being rung or the whistle blown? Was it through failure of the flash light system to function? Did the engine's dim headlight prevent the natural warning which an efficient light might have given?

Appellee himself has answered the query. The night was somewhat murky. The windows of his automobile were closed. It was chilly outside, and moisture from breathing within the closed cab "frosted" the windows

and visibility was interfered with because of mist on the outside. Almost at the instant appellee arrived at the crossing another car, coming from the opposite direction, cleared the tracks. Its headlights were shining. This car was between appellee and the oncoming train. At least one other automobile was on the west side of the tracks, and its headlights were shining upon appellee. With the interior of his cab windows frosted, and with mist blurring from without, appellee did not resort to the precaution of testing his windshield wiper to ascertain if it was in working order. His testimony is to the contrary.

With knowledge of the exact position of the tracks, and in the situation just described, appellee must have relied upon his sense of hearing in preference to his sense of sight, and not having heard a bell or a whistle (which we must assume were not being operated) he dashed over the crossing at a time when another automobile obstructed the view which assuredly would have been his had the automobile in question not been where it was, and if appellee's car windows had not been frosted and his windshield wiper inactive.

Counsel for appellee urge inapplicability of the Davis Case, because the collision there occurred in the daytime, while here it was night. It would be inaccurate to say, "that makes no difference." In certain conditions it might. It seldom happens that two crossing collisions are exactly alike. Each must be tried in view of the prevailing facts and circumstances, and the result must be tested by accepted principles of law.

To say in the instant case that appellee's negligence was not, as a matter of law, equal to or greater than that of appellants would be to disregard human experiences and known factors of physical operations, and this we cannot do. Of course, comparative negligence is a matter of jury determination, but there must be substantial evidence to sustain a verdict that a defendant's negligence was of a higher degree than that of the plaintiff, and such evidence is lacking in the case before us.

The judgment is reversed, and the cause dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.

MEHAFFY, J. (dissenting). The majority opinion states: "We reverse only for errors of law, the jury being the sole judge of factual matters, and of the credibility to be given the testimony of witnesses. If there is substantial evidence to support the jury's findings, and no errors of law appear, we do not reverse because, in our judgment, there is not a preponderance of evidence in favor of the verdict."

Another well established rule of this court is that in testing the sufficiency of evidence to determine whether it supports the verdict, we consider the evidence in the light most favorable to the appellee, and we give the evidence of the appellee its highest probative value in favor of the appellee, and indulge every inference deducible therefrom to support the finding of the jury. *Safeway Stores* v. *Mosley,* 192 Ark. 1059, 92 S. W. 2d 1136.

"This court has many times held that, where there is any substantial evidence to sustain the verdict of the jury, the verdict will not be disturbed, although this court might think that the weight of the testimony was the other way. This court does not pass on the credibility of the witnesses nor the weight of their testimony." *Southwestern Bell Tel. Co.* v. *McAdoo,* 178 Ark. 111, 10 S. W. 2d 503; *Ark. Power & Light Co.* v. *Orr,* 178 Ark. 329, 11 S. W. 2d 761; *Mo. Pac. Rd. Co.* v. *Juneau,* 178 Ark. 417, 10 S. W. 2d 867; *Mo. Pac. Rd. Co.* v. *Edwards,* 178 Ark. 732, 14 S. W 2d 230 These are only a few of the many cases in which we have held that the jury is the judge of the credibility of the witnesses and the weight to be given to their testimony, and that if there is any substantial evidence to sustain the verdict, it will not be disturbed by this court, although this court might believe that it was against the preponderance of the evidence. The reason for this rule is clear. We do not pass on the credibility of the witnesses nor the weight of their testimony; we do not see them, hear them testify, know nothing of their conduct and appearance on the witness stand. The jury is a better judge as to where the preponderance of the evidence lies than the Supreme Court.

I think that the majority opinion views the evidence in the light most favorable to the appellant. Just before it announced the rule above referred to, in the majority opinion it is stated: "The verdict, having been for the plaintiff, should have been set aside by the trial court if the quantum of the evidence—preponderance—was lacking."

Who determines where the preponderance of the evidence lies? We have always held that the jury should determine that question, and if there is any substantial evidence to support the verdict, it should be sustained.

The majority, in its opinion, says that in spite of the fact that appellee, a married man with three children, was patronizing a honky-tonk at one o'clock in the morning with a girl companion, etc., * * * a verdict could only be returned if supported by a preponderance of the testimony.

If the majority had desired, or intended, to consider the evidence in the light most favorable to the appellee, it would have stated that this married man had been separated from his wife for five years, and they lived in different towns. In order to make sure that persons who read the opinion will know what "honky-tonk" means, it states in footnotes: "Webster's dictionary defines honky-tonk as a 'low drinking resort.' " It thereby implies that the place appellee attended was a "low drinking resort." The undisputed evidence shows that it was a dance hall where they sold cold drinks, and the evidence further shows that they did not begin to sell beer at this place until June, after the accident in January. It occurs to me that in view of the evidence which shows that it was not a "low drinking resort," it is a bit unfair to insinuate that it is, and I think also that in doing that, the court was overlooking the rule that we should view the testimony in the light most favorable to the appellee.

It is also stated in the majority opinion that the "flash light system (through some mysterious caprice of mechanics) was not in order." There is not a word in the record indicating that the flash light system was not in order because of "some mysterious caprice of

mechanics." Several witnesses testified that it was not operating, and one witness testified very positively that he had seen it fail before this accident, and had seen it fail since the accident.

The majority opinion then says that appellee had other accidents, and the nature of the slight injuries testified about in one case by appellee are shown in the margin.

The pleadings in the case mentioned in the margin were admissible for the purpose only of affecting the credibility of the witness, and if this court does not pass on the credibility nor the weight of the testimony, why copy this testimony? The same may be said with reference to the majority's statement that appellee was a married man. That could only be introduced to affect appellee's credibility. These were questions within the exclusive province of the jury, and unless we are going to determine the credibility of the witnesses and where the preponderance of the evidence lies, why call attention to these things at all? We do not pass on them.

Mrs. Retha Carter testified that she was walking with two other persons and was near the railroad track when the appellee's car was hit. The first she knew about it was when she heard the noise at the time it hit the car. She was as close to the crossing as she could be not to be hit herself; she saw the train about the time it hit appellee; it had not whistled before that and the bell had not rung. She knew the train was coming about a minute and a half before it hit the car. It was so foggy she could hardly see. Witness did not notice any headlight shining, but saw the bulk of the engine, and when asked on cross-examination: "You just weren't paying any attention to it, were you?" she answered: "It didn't whistle." She further said that the train did not whistle and the bell was not ringing.

Cletus Price, a witness for appellee, testified about the photographs introduced.

Mrs. Lorine Davis testified that she saw the accident; the train had not whistled before it struck appellee; the bell on the train was not ringing; it was rainy and foggy that night.

Elza Chrisp testified that he lived at Alicia, was a farmer, and was at Hoxie the night of the accident; the train had not whistled until witness heard the crash; he did not hear a bell or a whistle, but heard the crash; thinks if the bell had rung or the whistle sounded, he would have heard it; it was foggy and misting rain. This witness was asked if he saw Mr. Price drinking anything that night. He said that he had not; did not see appellee and Vina Davis and several other girls drinking beer; none was sold that night; he thinks they started selling beer there in June; they were not selling any there then; he is positive of that; he did not see any flasher lights at the crossing; if they had been working they would have flashed on him; witness still says there was no whistle blown until after the crash; he saw a dim light on the train; in going through town they have a rule for dimming the light; he knows they have such a rule because he has railroaded; did not see a light on the train that night until the minute it was across the crossing in front of him; the fog made the street lights dim.

Fred Weeks testified that he saw the collision; was manager of a cafe across the street from the depot where the collision occurred; was looking at a car facing him and just as this car of appellee got on the center of the railroad track, the engine came on the crossing; up to that time the train had not whistled or the bell rung; there was no signal at all; he guessed the train had a head light, but it was very dim; the only light he could see about the engine was the fire in the fire-box; if there had been a signal he would have heard it; there was no whistle nor bell; does not think Price was running over 20 miles an hour, if that fast; it was a little foggy that night, and there was a heavy drizzle; did not see the flasher lights at the crossing; sometimes they do not work when a train comes in; has seen them fail to work when lightning hit them; saw them fail to work on one occasion after this accident; did not hear the train whistle at all that night; was paying attention and looking for the train and listening for the bell.

Appellee testified that he and his wife had been separated for five years and she did not live at Poca-

hontas then; Cash ran a dance hall and a cold drink place; he did not sell whiskey or beer; he stayed at the place thirty-five or forty minutes and started home; was driving at a speed of not more than 20 miles an hour; he knew there was a railroad crossing there; knew that a train might come, and he drove slowly; looked and listened for trains and did not hear or see any; the lights over the crossing were not shining; if there was a light on the train it was a mighty dim one; witness did not see any light on the train at all; never did see the train until it struck him; continued to look and listen for trains at both ends of the railroad and both sides of the highway until he was practically on the crossing; he had not seen or heard a train.

A. B. Bartlett, the engineer, testified that he had been working for the Missouri Pacific for 38 years and had been running an engine for 26 years, but this was his first trip on a passenger train; he was making a station stop and he saw the car when it stopped and he released the brakes; it had very bright headlight; witness could see it plainly; the car was possibly 200 feet from the track when he first saw it; when asked whether the car came to a complete stop, he said he thought it did. He also testified that the weather was cloudy and dark; the visibility was not good as it would have been on a brighter, moonlight night; the headlights on the automobile were shining bright; when he first saw the car he already had his brakes on.

I have copied the evidence tending to show the negligence of the railroad company at the time of the accident. The evidence shows that the train that hit appellee's car approached the crossing when it was dark and foggy with no headlights, no bell ringing, no whistle blowing, no flasher lights, in fact no warning of any kind. The evidence further shows that the engineer saw appellee in time to have stopped the train before he reached the crossing, but he says he thought appellee was going to stop. He should not have thought that; he should have known whether appellee stopped or not.

The majority opinion says: ''Of course, comparative negligence is a matter of jury determination, but

there must be substantial evidence to sustain a verdict that a defendant's negligence was of a higher degree than that of the plaintiff, and such evidence is lacking in the case before us."

• In other words, the majority opinion says that when an engine pulling a train comes into a town at the rate of 20 miles per hour with no headlight, no bell or whistle sounding, no flasher lights, and when the engineer himself testifies that he saw appellee in time to stop the engine, but he thought appellee was going to stop, that that negligence of the railroad company is not as great as the negligence of the traveler in the automobile who was approaching the crossing at a speed of about 15 miles per hour, looking in both directions and could not see a train, and listening, and was unable to hear, not because his doors were closed, but because there was no signal given. Will any fair-minded person believe this? I do not think so. And yet, the majority opinion says that this is a question for the jury. The jury passed on it and found the railroad company's negligence was greater than that of appellee. What right has this court to pass on the question? How is it possible for this court to pass on the question without passing on the credibility of the witnesses and the weight of their testimony? Decisions of this sort simply ignore the right of the jury.

Section 12 of art. 17 of the Constitution of the State of Arkansas reads as follows: "All railroads which are now or may be hereafter built and operated, either in whole or in part, in this state shall be responsible for all damages to persons and property, under such regulations as may be prescribed by the General Assembly."

It is true that this court has held that that provision of the Constitution does not mean what it says. "But this court has construed these provisions of the law to mean that railroads are liable only in cases where they have been guilty of some actionable negligence." *St. Louis, I. M. & So. Ry. Co.* v. *Pitcock*, 82 Ark. 441, 101 S. W. 725, 18 Am. St. Rep. 84, 12 Ann. Cas. 582.

Railroad companies and all other persons are responsible for all damages to persons and property caused by their negligence. They were liable for damages to

property caused by their negligence before the adoption of this provision of the Constitution. Therefore, the Supreme Court did not construe that provision of the Constitution, but annulled it, abrogated it. I think that provision of the Constitution means what it says.

If there is anyone who ever studied this question that doubts that the railroad company and other persons would be responsible for all damages to property caused by their negligence before the adoption of this provision, I have never seen such person. The judges of this court take an oath that they will support the Constitution of the State of Arkansas, and I think they should do it.

The majority opinion says: "The case is controlled by *Missouri Pacific Railroad Company v. Davis,* 197 Ark. 830, 125 S. W. 2d 785." The opinion in the Davis case states: "Under our Conparative Negligence statute (§ 11153, Pope's Digest) there may be a recovery, notwithstanding the negligence of the person injured, if that negligence is of less degree than that of the operatives of the train.

"We have held in numerous cases that it is the duty of the jury to weigh and compare the evidence and determine the relative degrees of negligence, and, that ordinarily, the finding of the jury is conclusive of the issue as to the degrees of negligence." *Mo. Pac. Rd. Co.* v. *Davis,* 197 Ark. 830, 125 S. W. 2d 785.

If this case were controlled by the Davis case, it would be affirmed. The truth is, as I understand the case, that the majority opinion correctly states the law, and then proceeds to decide the case directly contrary to the law as stated.

I think the evidence clearly shows that the negligence of the appellee was less than the negligence of the appellant; but if I did not think that, since the law authorizes the jury, and not this court, to pass on the question of the negligence of each party, and the jury did pass on this question, the case should be affirmed.

Mr. Justice HUMPHREYS agrees with me in this dissenting opinion.