**LOUISIANA & ARKANSAS RY. CO. v. SMITH.**
**No. 12456.**

Circuit Court of Appeals, Eighth Circuit.
Feb. 11, 1943.

Ben Shaver, of Texarkana, Ark. (A. L. Burford and A. G. Sanderson, Jr., both of Texarkana, Ark., on the brief), for appellant.

W. S. Atkins, of Hope, Ark. (Ned Stewart, of Texarkana, Ark., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

The Louisiana & Arkansas Railway Company brings this appeal from a judgment recovered by Leroy Smith, plaintiff, as damages for personal injuries received in a crossing collision. The accident which gave rise to this suit occurred on a clear day in mid-afternoon of September 17, 1941, when the motor truck which plaintiff was driving, a semi-trailer unit heavily loaded with logs, collided with defendant's southbound freight train at a public crossing about 690 feet south of defendant's depot in Patmos, Arkansas.

Defendant's track runs north and south through the town of Patmos on a right of way 100 feet wide. Located about 60 feet east of this track and parallel to it for a distance of several miles is a public highway. The crossing in question is at a right angle to this highway and provides a way over the tracks to a sawmill which is about 200 feet west of the crossing. About 182

feet north of the crossing is a small structure described as a seed house, and just north of it is a cantaloupe shed, both being about 20 feet west of the track. On the east side of the track, and by measurement 120 feet north of the crossing, stands a telephone pole. It appears that at the time of the accident there were stacked north of the crossing and at a distance of six or eight feet from the east side of the track, about three or four carloads of cross-ties. The testimony is conflicting as to just how far from the crossing these ties were stacked. No measurements were taken, but none of the testimony placed the ties any nearer than the telephone pole. Some of plaintiff's witnesses fixed the location still farther north and defendant's pictures reflected them as being even farther north than the seed house, which was 182 feet distant. The testimony as to height varied from six to ten feet. There also was evidence to the effect that between the crossing and the depot there is a gradual elevation of the ground which reaches a maximum of from three to five feet above that existing at the crossing, and that the ties were stacked in part upon this rise, thus producing an even higher obstruction to one's vision at the crossing. The civil engineer employed by defendant who made various measurements at the scene of the accident, testified that the ground was level with the top of the rail at the crossing and that the elevation began at a distance of 250 feet from the crossing. He further stated that at a distance of 375 feet from the crossing the natural ground is 3.1 feet higher than the top of the rail.

Plaintiff's own account of the occurrence of the accident was to the effect that he had been driving north on the highway with a load of logs destined for the sawmill. He lived in a house located on the east side of the road about 200 feet south of the crossing. He stopped there to permit his wife, who had been riding with him, to get off the truck. At that time, he said, he looked and listened for trains and saw or heard none. He then proceedeed north to the cross road and turned left to go over the crossing. He stated that at that time he looked in both directions but did not see a train approaching and could not have seen one because of the ties stacked along the right of way. It appears that he was driving at a speed of about 12 miles per hour. He said that the train's whistle did not blow and the bell did not ring and that he did not see the train until the truck was within a few feet of the rail. It was then too late to stop. He turned the truck to the left but the right front wheel went upon the track. It was at that point that the engine hit the truck. The impact of the collision turned the cab around to the left and threw plaintiff to the ground some 20 feet distant. Persons in the immediate vicinity at the time of the accident found plaintiff lying there, seemingly unconscious, and bleeding about the head. He was taken by ambulance to the hospital at Hope, Arkansas, from which he was discharged eleven days later. Plaintiff alleged that he suffered a concussion of the brain, severe strain of the muscles and ligaments of the right arm and shoulder, a severe bruise and laceration of the right cheek and is now suffering from traumatic neurosis which, it appears, is a nervous condition said to result from an injury. He testified that he is now totally disabled, that he suffers with severe headaches, dizziness, impaired breathing and insomnia. A neuro-psychiatrist attending plaintiff testified that his condition is growing worse. This testimony of the severity and extent of his injuries and his present physical condition was, however, contradicted both by the physician in attendance during plaintiff's recovery immediately after the accident and by a nerve specialist called by defendant.

The complaint charged defendant with negligence in the operation of its train, in that (a) the bell was not rung nor the whistle blown on the train as it approached the crossing, as required by the Arkansas statute, Section 11135, Pope's Digest of the Statutes of Arkansas; (b) defendant's train was operated at a high, dangerous and excessive rate of speed, and (c) that defendant's agents and employees operating the train failed to keep a proper lookout for persons crossing its track at the crossing. To this complaint the defendant answered by way of a general denial of negligence on its part and affirmatively alleged contributory negligence on the part of the plaintiff in that, inter alia, he carelessly drove upon defendant's track without exercising due care for his own safety.

The case was tried in May, 1942. At the close of the testimony defendant moved the court for a directed verdict on the ground that the testimony showed the injury alleged was caused by plaintiff's own negligence. After denial of this motion the case was submitted to the jury which returned a verdict in plaintiff's favor for

$29,500.00. After entry of judgment defendant moved for judgment notwithstanding the verdict, and in the alternative for a new trial on the ground that the verdict was so grossly excessive as to be the result of sympathy, prejudice or misconception of the evidence by the jury. This motion was denied, but the court found the judgment to be excessive by $12,000.00. Plaintiff then filed a remittitur for $12,000.-00. Thereupon the court reduced the judgment to $17,500.00. From this judgment defendant appeals.

It is urged by defendant upon this appeal that (1) the evidence shows the plaintiff's negligence as a matter of law was the sole cause of his injury and that his negligence equaled or exceeded defendant's negligence, if any, and therefore barred recovery by him for his injury; and (2) the verdict was so grossly excessive as to necessitate the granting of defendant's motion for a new trial. From the disposition which we make of this case upon defendant's first contention it becomes unnecessary to consider the second.

In the trial of the case plaintiff relied upon two of its three allegations of negligence; namely, failure to give the statutory signals and operation of the train at an excessive rate of speed. There was a conflict of evidence on both points. Plaintiff's witnesses testified that the train was running at a speed of from 40 to 50 miles per hour, while the engineer, fireman and brakemen on the train fixed its speed at 30 miles per hour. There was no testimony fixing the rate of speed as unusual or excessive. The train crew testified that while the whistle was not blown (the reason given being that the engineer reached for the brake instead of the whistle cord), the automatic bell was ringing. Six witnesses for plaintiff, in addition to himself, who were near the scene of the accident at the time it occurred testified that no signals were given. It is evident that the jury gave credence to the testimony of plaintiff's witnesses.

▇ The Arkansas statute, supra, imposes liability upon railroad corporations for damages sustained by any person by reason of neglect to give the statutory signals. But under certain conditions a failure on the part of the train crew to give such signals is not negligence constituting the proximate cause of the injury. Missouri Pac. R. Co. v. Doyle, 203 Ark. 1111,

160 S.W.2d 856; Missouri Pac. R. Co. v. Hood, 199 Ark. 520, 135 S.W.2d 329. The statute is not a bar to the defense of contributory negligence. However, for such defense to foreclose a recovery on the part of a plaintiff, plaintiff's negligence must equal or exceed the negligence attributable to the railroad company. Arkansas Comparative Negligence Statute, Section 11153, Pope's Digest of Statutes of Arkansas; Missouri Pac. R. Co. v. Howard, Ark., 161 S.W.2d 759.

This court said, in Bradley v. Missouri Pac. R. Co., 8 Cir., 288 F. 484, that if the plaintiff could have observed all the conditions at the crossing and the approach of defendant's train but failed to do so, then the failure to give the statutory signals was not the proximate cause of plaintiff's injury. In the case now before us it is contended that because of an obstruction to the view caused by stacks of crossties near the crossing it was impossible for one to see an approaching train. All of plaintiff's witnesses testified that not until one approached within eight to twelve feet of defendant's track was it possible to see for any great distance north on the right of way. Though the exact location of the ties is controverted, yet it is clear from the testimony of these witnesses that for a distance of at least 120 feet the view was free of all obstruction whatsoever. On the trial, defendant attempted to show in addition that by reason of the height of a locomotive as compared to the height of the ties a train would be visible over the top of the ties to a motorist approaching the crossing. Upon cross examination one of plaintiff's witnesses did so testify. The witness Wallace stated:

"Q. Coming up to this crossing and crossing here, there wasn't a thing to obstruct anybody's view across here to those ties and the seedhouse, coming along here, even before you turned off, you could see? A. Yes, sir.

"Q. There was not a thing to obstruct your view? A. No, sir.

"Q. And coming along here you could see through there? A. Coming along the road you could see over the top of those ties.

"Q. Those ties were not as high as the seed house? A. No, sir.

"Q. And a box car is very nearly as high as the seed house? A. Probably the same height.

"Q. And a man could see the top half of a box car even with those ties there? A. Yes, sir.

"Q. He wouldn't have to get within twenty feet of the crossing, would he? A. No, sir."

There is also testimony to the effect that the train was proceeding on the track "under steam." Defendant contends that to an observant person about to attempt a crossing of the tracks the plume of smoke from the engine's stack should have been visible, even though it be conceded that the ties might have concealed the engine itself. It also appears that all of plaintiff's witnesses who were in the vicinity at the time of the accident knew of the approach of the train when it was as far away as the depot by reason of the noise which it was making.

Plaintiff testified that he looked to see if any train was approaching when he turned left off the highway to go up to the crossing. At that time he was approximately 50 feet from the center of the track. He stated that he was not aware of the train's presence until he was within less than eight feet from the crossing and then it was too late to stop short of the track. There is evidence that plaintiff, after he left the highway and as he neared the crossing, was not watching for approaching trains. Edward Barton, a 12 year old boy, who was plaintiff's only eyewitness to the accident, stated:

"Yes, sir, I saw him drive up on the track. When he got up there he just looked like he was looking down toward the skidways down there; yes, sir, instead of the track. * * * No, sir, he wasn't looking that way at all. Yes, sir, he was looking straight over at the skidway."

This is corroborated by the fireman who saw the accident from his side of the engine cab. He stated that plaintiff did not look in the direction of the train until he was about eight feet from the track. The fireman further testified that for some distance he saw the truck approaching the crossing but thought that because of its slow speed the driver was about to stop. When he realized that the truck was not stopping he "hollered" to the engineer, who was just reaching for the whistle cord but who then, instead, applied the brakes.

■ We have before had occasion to consider at length the many decisions of the Arkansas Supreme Court upon railroad crossing accident cases. In Missouri Pac. R. Co. v. Baldwin, 8 Cir., 117 F.2d 510, the same contention was made as is urged before us now. In the course of that decision we recognized the seeming conflict in the cases and set out the leading decisions in support of each side of the issue. However, we noted in particular the most recent declarations by the Arkansas Court, and concluded that those decisions made it clear that there can be no recovery against a railroad for negligent operation of its trains where the only reasonable inference from the evidence is that the negligence of the plaintiff was the sole proximate cause of the injury and that negligence of the railroad was not a proximate cause. Crossett Lumber Company v. Cater, 201 Ark. 432, 144 S.W.2d 1074; Missouri Pac. R. Co. v. King, 200 Ark. 1066, 143 S.W.2d 55. In that case we concluded that the proximate cause of the accident was the negligent operation of the truck in which plaintiff was riding in that a lookout was not kept for approaching trains at a time when the train was in fact in full view.

We have been cited here to a more recent decision of the Arkansas Court upon this point, Missouri Pac. R. Co. v. Howard, Ark., 161 S.W.2d 759. In that case the view of the crossing at which the accident occurred was obstructed by the presence of box cars which had been spotted within four or five feet of the crossing. The evidence was clear that an approaching train could not be seen by a motorist until he came within a few feet of the tracks. The court held that notwithstanding a failure of the train crew to sound the statutory signals, the plaintiff was negligent in proceeding upon such a crossing which she could observe to be a dangerous one, before stopping and looking and listening at a point at which she could determine whether or not it was safe to proceed across the tracks. Such negligence was held to be the proximate cause of the accident and judgment for plaintiff was reversed. The decision in the Howard case was cited with approval and followed by the Arkansas Court in a later case, Missouri Pac. Ry. Co. v. Carruthers, 162 S.W. 2d 912.

■ Counsel for plaintiff has attempted to distinguish the various cases upon their respective facts. We have before reiterated with approval the statement of the Arkansas Court in Missouri Pac. R. Co. v. Price, 199 Ark. 346, 133 S.W.2d 645, 648,

that "Each [crossing collision case] must be tried in view of the prevailing facts and circumstances, and the result must be tested by accepted principles of law." Kansas City Southern Ry. Co. v. Ray, 8 Cir., 109 F.2d 708. While the result of the cases cited to us may differ, yet examination of them would seem to compel the conclusion that where it is apparent from the evidence that plaintiff did not see the train because he did not look for it at a time when he was in a position to see its approach and to determine if he could proceed with safety, then his failure to so act, and not the failure of the train crew to give the signals, was the proximate cause of the accident.

In this case, even though the ties were stacked to a height obscuring the view of an approaching train, the evidence is uncontradicted that the crossing was unobstructed for a distance of at least 120 feet and that when one approached the crossing to within a distance of from 8 to 12 feet from the track the view of the track was clear for an indefinite distance. It appears also that after this plaintiff had begun his approach to this crossing, with which he was entirely familiar, having crossed it every day in the course of his work, and which he knew to be dangerous because of the presence of the ties, he did not look or listen for the presence of a train. The conclusion seems inescapable that if, during the time he was traversing the 50 feet from the edge of the right of way to the tracks, plaintiff had looked in the direction from which the train was coming, he could have seen the train within the 120 feet of clear view which admittedly existed. And if not then, that if he had proceeded with due regard to the dangers inherent in this crossing by reason of the presence of the ties and had looked and listened when he was at a distance from which it is conceded he could have seen the track, he would have been aware of the train's approach. Plaintiff's conduct here seems more clearly to have been negligent than was true in the Howard case.

We hold that under the controlling Arkansas law, notwithstanding defendant's failure to give the statutory signals, the evidence is clear that plaintiff's negligence was the proximate cause of the injury and the trial court erred in refusing to direct a verdict for defendant.

Judgment reversed and cause remanded to the District Court with directions to enter a judgment of dismissal.